Charles W. Balthrope and Mary V. Balthrope v. Commissioner.
Balthrope v. Commissioner
Docket No. 93514.
United States Tax Court
T.C. Memo 1964-31; 1964 Tax Ct. Memo LEXIS 305; 23 T.C.M. (CCH) 156; T.C.M. (RIA) 64031; February 11, 1964
*305 1. Petitioners sold all of the stock of Radio KITE, Inc., in 1958 under two separate contracts. The first contract provided that buyer would pay seller $292,000 for the stock and the "net quick assets" of the corporation. The second contract provided that buyer would pay seller $150,000 for managerial and consulting services and for a covenant not to compete for 10 years. Held, the payments received during the taxable years under the second contract were not a part of the selling price of the stock and are taxable to petitioners as ordinary income. 2. Held, petitioners are not entitled to report their gain on the sale of stock in Radio KITE, Inc., on the installment basis because they received more than 30 percent of the selling price in the year of sale. 3. Held, a note in the amount of $575 was not shown to be worthless in the year 1958, and petitioners are not entitled to a bad debt deduction therefor. *306 R. N. Gresham, 2100 National Bank of Commerce Bldg., San Antonio, Tex., for the petitioners. Robert I. White, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent has determined deficiencies in petitioners' income tax for the taxable years 1958 and 1959 in the respective amounts of $50,437.82 and $211.57. Petitioners claim overpayments in income tax for the years 1958 and 1959 in the respective amounts of $6,000 and $23,074. The issues for decision are: (1) Whether certain of the payments received by Charles W. Balthrope, *307 who will hereafter be referred to as petitioner, in 1958 and 1959 in connection with the sale of all of the stock of Radio KITE, Inc., represent ordinary income as compensation for consulting services and for a covenant not to compete, or capital gains as proceeds from the sale of the stock; (2) Whether petitioners are entitled to report gain from the sale of stock in Radio KITE, Inc., on the installment basis for 1958 and 1959; and (3) Whether petitioners are entitled to a bad debt deduction in 1958 in the amount of $575, the face amount of a note of the San Patricio Broadcasting Co.
An issue as to whether the value of life insurance policies on petitioner's life, received by petitioner in 1958 and 1959 from certain pension trusts, constitutes ordinary income or capital gain was waived by petitioners on brief. Petitioners' claim to a deduction of $1,000 in 1958 for a charitable contribution to Hospitals Building Fund, Inc., the obligation for which petitioner assumed upon the sale of Radio KITE, Inc., appears to have been claimed by petitioners on their tax return for 1958 and allowed by respondent - so it is assumed that there is no issue with respect to this item. Findings *308 of Fact Some of the facts have been stipulated and are found accordingly. Petitioners are husband and wife who resided in San Antonio, Tex. They filed Federal income tax returns for the years 1958 and 1959 with the district director of internal revenue, Austin, Tex. Radio KITE, Inc. (hereafter sometimes referred to as KITE, Inc.), is a Texas corporation. From 1947 through 1958 the principal business of KITE, Inc., was the operation of a commercial AM and FM radio station in San Antonio, Tex. Petitioner went into the radio business in San Antonio in 1936 as a salesman for a local station. He later became assistant manager of the station and left to become manager of another station in San Antonio before entering the service during World War II. He returned to this position after leaving the service and remained manager until he resigned to establish his own radio station. Petitioner formed Radio KITE, Inc., in 1947 and obtained the original licenses from the FCC for KITE, the AM station, and for KITE-FM, the FM broadcasting station. Petitioner started the stations with limited capital and with five or six employees. He continued to personally manage the stations until 1958 *309 when he sold his stock in KITE, Inc. Petitioner acquired 20,000 shares of stock of KITE, Inc., as follows: Date
Number of shares
Jan. 1, 1954
18,400
Jan. 21, 1958
200
Apr. 15, 1958
1,400
Thereafter until the sale of the stock by petitioner in 1958 he owned all of the issued and outstanding shares of stock of KITE, Inc.
Petitioner devoted a great deal of time and attention to the operation of the broadcasting stations, and in 1949 he developed hypertension and high blood pressure, conditions which persisted and worsened. He received medical attention for these conditions, and in January 1957 he was hospitalized for 4 days for a condition resulting from an enlargement of his heart. The intensity of his hypertension increased, and petitioner was advised by his physician that the only cure for his ailment was rest and relief from the pressure of business. Following his hospitalization in January 1957, his physician also advised him that if selling his radio business would relieve the tensions and worries to which he was subject he should do so. Petitioner discussed the matter with his wife, who urged him to sell the stations or relinquish active management. *310 Petitioner's decision to sell was precipitated by his hospitalization in April 1958 with evidence of coronary heart disease. After this hospitalization he contacted a friend, William Stubblefield (hereafter called Stubblefield), of the firm of Hamilton, Stubblefield, Twining and Associates, whose principal business was that of brokers of broadcasting stations. He told Stubblefield that he was ill and could no longer operate the radio business and that he wanted to sell the business as soon as possible. Stubblefield made arrangements to discuss the matter with petitioner at an association meeting in Los Angeles which petitioner planned to attend if his physician permitted. Petitioner, accompanied by his wife, attended the meeting and showed financial statements of the business to Stubblefield and Dewitt Landis (hereafter called Landis), who was associated with Stubblefield's firm with his office in Dallas, Tex. They studied the financial statements and copied them. Stubblefield told petitioner that the value of his business might be $400,000; Landis estimated $450,000. Stubblefield contacted Connie B. Gay (hereafter referred to as Gay) who was attending the convention. Gay lived in *311 Virginia and, as an individual and through several corporations which he controlled, he operated AM radio and television broadcasting stations in Virginia and the East. He owned all the capital stock of Connie B. Gay, Inc., a Delaware corporation (hereafter referred to as Gay, Inc.). Landis gave Gay copies of the financial statements of KITE, Inc., but petitioner did not meet Gay at the convention, although Stubblefield told him that Gay might be interested in buying his business. Shortly after the convention, on May 14, 1958, Landis, then in Dallas, was contacted by Stubblefield's office, which was in Washington, D.C. Landis was told that Gay planned to travel to San Antonio and that he would stop in Dallas, where he wanted Landis to meet him. Landis joined Gay and they flew together to San Antonio where Landis had an extended meeting with petitioner that evening at Landis' hotel. They discussed the prospects of petitioner's sale to Gay, and Landis told petitioner that he would try to obtain $450,000 for the business. Gay visited the radio stations that evening and contacted Landis early the next morning. He authorized Landis to offer petitioner $400,000 for the business, $100,000 *312 in cash, with petitioner paying the brokers' commission. Landis typed a rough draft of a proposed contract of sale and asked petitioner to come to the hotel that afternoon to discuss the proposal. Landis, by this time, had told Gay that petitioner wanted to sell the business because of his bad health; and petitioner had told Landis that he wanted to be able to report gain from the sale, for Federal income tax purposes, on the installment basis. Gay had discussed the potential tax effects of the transaction with Landis. Petitioner, whose regular accountant was out of town at the time, had no advice as to tax effects of the transactions during negotiations or discussions with Landis or with Gay. Petitioner met with Gay and Landis that afternoon, May 15, 1958, at Landis' hotel. He was anxious to sell to Gay since he knew that he would have to sell in any event and he felt that he could obtain a better price from a sale to the first person interested in purchasing. When petitioner first met Gay and Landis, Gay told him that he would pay $400,000 for the business if petitioner would agree that $150,000 of the $400,000 be for consulting services on petitioner's part and for a contract *313 requiring petitioner to refrain from competing with the business being sold for a 5-year period. Petitioner told Gay that he had no objections to the terms and that, since he was selling for reasons of health, he was willing to enter into an agreement not to compete during his lifetime. The possible income tax effects of such a provision were not discussed. Petitioner and Gay then began the review of the draft of a proposed contract which Landis had prepared. They made several changes in it, and it was discarded. Petitioner typed another agreement, which provided in part as follows: May 15, 1958 This is a tentative sales contract between Connie B. Gay and Charles W. Balthrope, whereby Balthrope is to sell to Gay the assets of Radio Station KITE(AM), on the following terms and conditions: 1. Sale price to be: a. $100,000 (one hundred thousand dollars) down upon closing, following FCC approval. b. $150,000 (one hundred and fifty thousand dollar) at the rate of $15,000 per year for five years, payable monthly, and $75,000 during the sixth year, payable during the sixth year, payable monthly with interest at the rate of 5% per annum on the unpaid balance. The buyer is to have *314 the right to prepay the final year's payment at any time without penalty. The $75,000 payable over five years is not prepayable ahead of time except by payment of interest as it would normally fall due. c. $150,000 (one hundred and fifty thousand dollars) in consulting and management fees to Charles W. Balthropw [Balthrope] and/or assigns to be paid in monthly installments of $1,250 per month for 120 months. This is to be covered by a separate contract. d. The payment referred to in parabraphs b and c shall begin on the first day of the next month following thirty days after closing. e. The buyer, Connie B Gay, shall personally gurantee $100,000 (in par b above) and will give first mortgage on personal property and deed of trust on the real property to secure payment as outlined in pars. b and c above, and will give written assurance that in case of default by buyer, he will cause to have properly filed voluntary assignment of the Radio station KITE license back to Balthrope or his assignee. * * *
[Provision for Balthrope to lease the FM equipment with option to purchase.] Balthrope may buy at book value from KITE assets the automobile and boat owned by KITE. Balthrope *315 is to retain net quick assets (current assets less current liabilities) of KITE as of May 31, 1958, and Baltthrope's [Balthrope] salary is to be terminated as of that date. * * *
[Provision for brokers' fee to be paid by Balthrope out of downpayment.] Balthrope is to give a covenant not to compete in AM radio in the San Antonio market for ten years. In a formal contract of sale, which we agree to enter into, a fixed cash value on the covenant and also upon the leases and consulting contract will be made. This agreement was executed by Gay and petitioner as parties and by Landis as a witness that afternoon, and Landis and Gay then returned to Dallas. Landis wrote petitioner on May 15, 1958, advising him that Landis' firm agreed to accept $15,800 as their commission on the sale to Gay. As of May 15, 1958, KITE, was licensed by the FCC to broadcast during the daytime only, and an application for a license for nighttime operations was then pending. This application had been assigned a processing line number by the FCC in the name of KITE, Inc. Gay was interested in broadcasting at night with radio station KITE, and he knew that the FCC had granted a processing line number *316 to KITE, Inc.
Shortly thereafter, Stubblefield contacted petitioner and told him that Gay wanted to buy all of petitioner's stock in KITE, Inc., rather than buy the assets of the corporation as had been agreed to on May 15, 1958. Petitioner told Stubblefield that a sale of the stock would be agreeable to him, and petitioner was sent contracts dated May 24, 1958, which he executed. The first provided: AGREEMENT THIS AGREEMENT is entered into this 24th day of May, 1958 by and between Charles W. Balthrope, hereinafter often called the Seller, and Connie B. Gay, hereinafter often called the Buyer, WITNESSETH: WHEREAS, the Seller owns all of the outstanding stock (2,000 shares of Class A and 18,000 shares of Class B) of Radio KITE, Incorporated, licensee of Radio Station KITE and Station KITE-FM, San Antonio, Texas, which stock he desires to sell to the Buyer; and WHEREAS, the Buyer desires to purchase the aforesaid stock from Seller: NOW, THEREFORE, in consideration of the mutual covenants hereinafter contained, the parties hereto mutually agree as follows, all subject, however, to the approval of the Federal Communications Commission: 1. Seller agrees to sell to the *317 Buyer and the Buyer agrees to purchase from the seller in Radio KITE, Incorporated, which stock consists of 2,000 shares of Class A and 18,000 of Class B common, being all of the stock authorized and outstanding of each class. 2. The total purchase price of the aforesaid stock is Two Hundred Fifty Thousand Dollars ($250,000), which shall be payable as follows: (a) Twenty Thousand Dollars ($20,000) in cash to be placed in an escrow account with Hamilton, Stubblefield, Twining and Associates, Inc. in a Texas bank by Buyer upon the execution of this Agreement by the parties hereto, which escrow sum shall be part of the down payment at the closing date. If the Federal Communications Commission should not give its consent to the transfer of control of Radio KITE, Incorporated, or if Seller refuses to consummate the transfer pursuant to Commission consent, the escrow sum shall be repaid to Buyer. If Buyer refuses to consummate the transfer pursuant to Commission consent, the escrow sum shall be paid to Seller as liquidated damages. (b) The Buyer shall pay to Seller an additional sum of Eighty Thousand Dollars ($80,000) at the time of final closing. (c) The Buyer shall pay to Seller *318 One Hundred Fifty Thousand Dollars ($150,000) at the rate of Fifteen Thousand Dollars ($15,000) per year for five (5) years, said sum to be represented by a Seventy-Five-Thousand-Dollar ($75,000) note to be paid in equal instalments of One Thousand Two Hundred Fifty Dollars ($1,250) per month plus interest at 5% on the unpaid balance, and the remaining Seventy-Five Thousand Dollars ($75,000) to be paid during the sixth (6th) year, said sum to be represented by a note to be paid in equal instalments of Six Thousand Two Hundred Fifty Dollars ($6,250) per month plus interest at 5% on the unpaid balance, said interest to begin at the final closing date. The Buyer shall have the right to prepay the second Seventy-Five-Thousand-Dollar ($75,000) note at any time without penalty. However, the first Seventy-Five-Thousand-Dollar ($75,000) note, payable over five (5) years, is not prepayable except to the extent of a lump-sum payment of interest in an amount that would normally accrue during the five-year life of the note. The payments mentioned above shall begin on the Fifteenth Day of the next month Thirty (30) days after final closing. * * *
[Pertaining to seller's right to operate *319 the FM station and later buy the equipment.] 6. The Seller agrees that if he should decide to sell or otherwise dispose of the FM station, he will afford Gay the right of first refusal to purchase the station. Similarly, if Gay should decide to sell or otherwise dispose of AM Station KITE, he will afford Balthrope the right of first refusal to purchase that station. Both purchase rights shall be exercised within a period of ten (10) days after written notice is given by the prospective seller of his desire to sell. 7. For bookkeeping and accounting purposes, the parties hereto agree to a cut-off date as of midnight, May 31, 1958. After that time, the income from the operation of KITE shall accrue to the Buyer and the expenses of operation shall be charged to the Buyer. The Seller shall retain the net quick assets, that is, all current assets less current liabilities. The accounts receivable as of May 31, 1958, as thereafter collected, shall be placed in a separate account or otherwise segregated so that they, less the usual expenses of collection, will be readily available to the Seller. However, no collection charge shall be made by the Buyer. The Seller, as president and majority *320 stockholder of the licensee, shall retain full responsibility for the supervision of the operation of Station KITE until the closing date. * * *
[Pertaining to seller's warranties.] 13. The terms of this Agreement shall inure to the benefit of and shall be binding upon the parties hereto, their heirs, successors, personal representatives, and assigns. 14. After the consent of the Federal Communications Commission has been obtained and the contemplated stock transfer effected, the Buyer-Transferee shall have and exercise control of Radio KITE, Incorporated. IN WITNESS WHEREOF, the parties hereto have executed this Agreement in triplicate (one copy for filing with the Federal Communications Commission) this 24th day of May, 1958. Witness: (s) Wm. J. Stubblefield (s) Charles W. Balthrope, Charles W. Balthrope, Seller-Transferor Witness: (s) Wm. J. Stubblefield (s) Connie B. Gay, Connie B. Gay, Buyer-Transferee The second contract (hereinafter referred to as the consulting contract) provided: AGREEMENT Connie B. Gay has this day entered into an Agreement with Charles W. Balthrope for the purchase of the stock of Radio KITE, Incorporated, licensee of *321 Stations KITE and KITE-FM, but which comprehends only the license of Station KITE (AM), it being the understanding that the KITE-FM license will be assigned to another corporation of which Balthrope is the owner. It is the intention of Gay, after the consummation of the proposed transfer, to assign all of the assets of the corporation, together with the KITE (AM) license, to another corporation. He desires to have the continued advice and assistance of Balthrope and of his wife, Mary Virginia Balthrope, in the operation of Station KITE (AM) and to be assured that they or neither of them will compete with him in the operation of a standard broadcast station in the San Antonio area. THEREFORE, in consideration of the mutual covenants herein contained, Connie B. Gay and Charles and Mary Balthrope agree as follows: 1. Connie B. Gay agrees to pay to Charles W. Balthrope and/or Mary Virginia Balthrope the sum of One Hundred Fifty Thousand Dollars ($150,000) as compensation for consulting and managerial services to be rendered by them or the survivor of them to the operation of KITE for a period of ten (10) years, said sum to be paid in monthly installments of One Thousand Two Hundred *322 Fifty Dollars ($1,250) per month, starting on the 15th day of the next month thirty (30) days after closing. 2. Charles W. Balthrope and Mary Virginia Balthrope agree and covenant that they will not in any manner enter into or participate in a standard radio station operation within a radius of 40 miles of Terrell Hills, Texas, for a period of ten (10) years subsequent to closing under the other Agreement. 3. Connie B. Gay realizes that the foregoing represents a very modest arrangement and that some further consideration should be provided. Accordingly, he further agrees that, if neither Charles W. nor Mary Virginia Balthrope should survive the term of this agreement, he will pay the remaining installments due hereunder to the estate of the last survivor but with the privilege of anticipating the balance due without penalty. 4. The terms of this Agreement shall inure to the benefit of and shall be binding upon the parties hereto, their heirs, successors, personal representatives, and assigns. IN WITNESS WHEREOF the parties hereto have executed this Agreement in triplicate this 24th day of May, 1958. (s) Charles W. Balthrope, Charles W. Balthrope (s) Mary Virginia Balthrope, *323 Mary Virginia Balthrope (c) Connie B. Gay, Connie B. Gay WITNESS: (s) Wm. j. s/tubblefield Gay also wrote petitioner under date of May 24, 1958, advising him that petitioner could buy a car and a boat owned by KITE, Inc., at book value, and that notes for the purchase price of petitioner's stock of KITE, Inc., would be secured by a mortgage on the real and personal property owned by the corporation. These two notes, each in the principal amount of $75,000, were executed, as agreed, payable to petitioner. Stubblefield also wrote petitioner under date of May 24, 1958, confirming the arrangement by which his firm had received, and would deposit in a trustee's account, $20,000 from Gay. FCC's approval of the transfer of stock of KITE, Inc., from petitioner to Gay was announced during early August 1958. Prior to that time petitioner had been advised by his accountant that petitioner's retention of the "net quick assets" of KITE, Inc., might constitute the distribution to petitioner of a taxable dividend. After petitioner received this advice, he and Gay, on behalf of Gay, Inc., entered into an agreement dated August 5, 1958, which provided in part as follows: Supplemental *324 Agreement WHEREAS, CHARLES W. BALTHROPE, of San Antonio, Bexar County, Texas, has contracted to sell to CONNIE B. GAY, INC., a private corporation, organized and existing under the laws of Delaware, all of the outstanding shares of stock of RADIO KITE, INC., a private corporation, organized and existing under the laws of Texas, in accordance with a certain Agreement of Purchase and Sale dated May 24, 1958, as modified by Agreement of even date therewith, to which Agreement reference is here now made for all purposes; and WHEREAS, the total agreed purchase price of the said shares of stock under said Agreement is TWO HUNDRED FIFTY THOUSAND and No/100 DOLLARS ($250,000.00) and said Agreement contained a provision that the said CHARLES W. BALTHROPE would retain the net quick assets of the said RADIO KITE, INC., as of May 31, 1958, which net quick assets were defined to be all current assets less all current liabilities; and WHEREAS, it is the desire of the undersigned parties to modify said Agreement to the extent of deleting said provision concerning the retention of said quick assets by CHARLES W. BALTHROPE and to substitute in lieu thereof a provision that the purchase price *325 of said shares of stock shall consist of ONE HUNDRED THOUSAND and No/100 DOLLARS ($100,000.00) cash, the execution and delivery of two (2) said promissory notes in the principal sum of SEVENTY-FIVE THOUSAND and No/100 ($75,000.00) DOLLARS each, and in addition the obligation of CONNIE B. GAY, INC., to pay to CHARLES W. BALTHROPE the sum of $42,000.00 payable in 42 equal monthly installments * * *
WHEREAS, said Agreement of Purchase and Sale by inadvertence and mistake contained a warranty by the said CHARLES W. BALTHROPE that all of the fixed assets of the said RADIO KITE, INC., are free and clear of all liens, incumbrances or liabilities of any kind whereas in truth and in fact certain real property owned and used by the said RADIO KITE, INC., for a transmitter site in Bexar County, Texas, is subject to a vendor's lien and deed of trust lien to secure the unpaid portion of the purchase price thereof and the undersigned parties wish to alter and modify said warranty in said Agreement to the extent and only to the extent of excluding from the operation thereof such real property against which exist said liens: NOW, THEREFORE, in consideration of the premises and of the mutual *326 covenants contained in said Agreement of Purchase and Sale and in consideration of the mutual covenants contained in this Supplemental Agreement, it is agreed by the undersigned parties as follows: THAT Paragraph 7 of said Agreement of Purchase and Sale dated May 24, 1958, be, and it is hereby, amended and modified to the extent and only to the extent that the provision thereof pertaining to the retention by the said CHARLES W. BALTHROPE of the net quick assets, including the accounts receivable, of RADIO KITE, INC., as of May 31, 1958, is deleted and in lieu thereof the undersigned parties agree as follows: THAT the purchase price of said Shares of Stock shall consist of the following: (1) ONE HUNDRED THOUSAND and No/100 ($100,000.00) DOLLARS cash; (2) The execution and delivery to CHARLES W. BALTHROPE of its two (2) certain promissory notes in the aggregate principal sum of ONE HUNDRED FIFTY THOUSAND and No/100 ($150,000.00) DOLLARS payable to the order of the said CHARLES W. BALTHROPE; and (3) The obligation of the said CONNIE B. GAY, INC., to pay to CHARLES W. BALTHROPE in cash the sum of $42,000.00, which is payable in 42 equal monthly installments of $1,000.00 each, *327 and which obligation to so pay said sum in cash is hereby created. In early August 1958 the FCC approved the sale by petitioner, and the transaction was closed, but it was discovered that there was outstanding a debt of KITE, Inc., secured by a mortgage on certain property of the corporation. Because of the warranties contained in the contract of May 24, 1958, Gay insisted that petitioner discharge the debt of $12,342.84 which constituted a lien against the transmitter site, as mentioned in the agreement above. Petitioner agreed to do so and gave Gay, Inc., his noninterestbearing note, dated August 6, 1958, for the amount of the debt of KITE, Inc. Petitioner paid this note in December 1958. At the final closing of the transaction petitioner received from the escrow fund of $20,000 held by Stubblefield the amount of $4,200, which remained after the firm's commission had been deducted from the fund, and petitioner received the amount of $80,000, the remainder of the downpayment specified in the contract of sale. Gay, Inc., or Gay, paid to petitioner $5,000 and $15,000 in the years 1958 and 1959, respectively, on the principal sums of the two promissory notes executed pursuant to *328 the contract of sale. Gay, Inc., or Gay, also paid petitioner $4,000 in 1958 and $12,000 in 1959 on the $42,000 obligation specified in the supplemental agreement of August 5, 1958. [1]
Gay, Inc., or Gay, paid petitioner $5,000 and $15,000 in the years 1958 and 1959, respectively, under the agreement of May 24, 1958, by which Gay contracted to pay petitioners $150,000 for "consulting and managerial services." Petitioners reported these amounts as ordinary income from "Consultants Fees" on their returns for 1958 and 1959. Gay, Inc., or Gay, deducted these payments on its or *329 his income tax returns for 1958 and 1959 as "Consultation Fees." Petitioner was responsible for the operation of the radio stations until the date of closing of the transaction early in August 1958. Differences arose between petitioner and Gay as to certain assets and liabilities of KITE, Inc., as of the date of closing. At the closing date petitioner owed KITE, Inc., and there was shown on the books and records of the corporation an open account receivable from petitioner in the amount of $8,407.11. Petitioner paid this amount to Gay by check dated December 9, 1958. Also, a pledge for a contribution to Hospitals Building Fund, Inc., in the amount of $1,000 had been made in the name of KITE, Inc. This amount was pledged in February 1958 but it did not appear as a liability of the corporation as of the date of closing, and petitioner, under date of August 6, 1958, agreed to relieve KITE, Inc., of any liability with respect to the pledge. He wrote the fund on September 16, 1958, asking that the pledge be made in his name individually rather than in the name of the corporation. He contributed $1,000 to the fund by check dated December 4, 1958, and petitioners, on their 1958 return, *330 claimed a deduction for charitable contribution in the amount of $1,000 for the payment to the fund. This deduction has been allowed by respondent in determining the deficiency for 1958 here involved. One of the assets shown on the records of KITE, Inc., at the date of closing was a note of San Patricio Broadcasting Co. in the amount of $575. Gay insisted that petitioner buy this note from KITE, Inc., and petitioner paid Gay, Inc., the amount of $575 by check dated October 31, 1958. The note was then endorsed in favor of petitioner, who claimed a bad debt deduction for it on his 1958 return because he considered it worthless. The note was paid in full in 1959 when the maker was sold, and petitioner reported the amount received as ordinary income in 1959. On September 17, 1958, petitioner was presented by one of Gay's employees with a list of expenses shown on the books and records of KITE, Inc., as having been incurred from June 1, 1958, to the date of closing of petitioner's sale to Gay. These expenses totaled $7,895.41, and Gay took the position that they should be paid by petitioner. After extended negotiations, petitioner agreed to pay the amount of $2,508.62, which he paid *331 by check dated December 9, 1958. He also paid the amounts of $126.29 and $265.51 (refund of pro rata share of prepaid insurance on automobile and boat) by checks dated October 11 and October 20, 1958, respectively. Petitioner, in a closing statement sent to the brokers and his attorney by letters dated December 31, 1958, [2] computed the sale of the stock as follows: Cash received:
$ 84,200.00
(Presumably the $100,000 downpayment less the brokers' com-
mission of $15,800)
Cash returned: Long-term liability (mortgage)
$12,342.84
C. W. Balthrope - a/rec.
8,407.11
Radio KANN - note rec.
575.00
Settlement
2,508.62
23,833.56
Net cash to C. W. Balthrope
60,366.43 [1]
Notes: $75,000
75,000
42,000
192,000.00
Total sales
$252,366.43
The $252,366.43 figure was used as the sales price of the stock by petitioner in reporting his gain on the installment sale of the stock on his 1958 and 1959 returns, from which he deducted his cost of $16,896 and expenses of sale in the amount of $2,749.40, for a net gain of $232,721.03. After *332 petitioner sold the stock of KITE, Inc., to Gay he leased the FM broadcasting facilities of KITE and operated an FM radio broadcasting station, KEEZ-FM, serving the San Antonio area. In 1962 petitioner purchased these facilities. Petitioner also operated a background music station in San Antonio in 1958 and 1959. He maintained an office in San Antonio during these years and deducted the expenses of its operation. He referred to his business as "business consultant." However, he spent only 6 or 7 months of each year in San Antonio, vacationing in Rockport, Tex., for the remainder of each year. He devoted about 3 or 4 hours each day to his businesses when he was in San Antonio, and did not actively manage either the FM station or the background music business. From time to time after August 1958 petitioner wrote letters to Gay or his employees, making suggestions about advertising, promotional and operational methods for KITE, and for cooperative announcements for KITE over petitioner's FM station. Mary V. Balthrope occasionally made telephone surveys for KITE during this period. Gay sold KITE to Townsend U.S. & International Growth Fund, Inc., sometime in 1960 or 1961. The net worth *333 of KITE, Inc., as shown on its books as of May 31, 1958, was $73,902.80. The depreciated book value of equipment and improvements was $23,333.48; the book value of land was $20,037.54; and total assets amounted to $115,144.11. [3] Liabilities totaled $41,241.31. In determining the deficiencies herein, respondent determined that petitioners are not entitled to report gains from the sale of KITE, Inc., stock on the installment basis since amounts received in 1958 from the sale ($109,000), less the amount returned to the purchaser ($12,342.84), or the net amount of $96,657.16, exceeded 30 percent of the selling price ($292,000). It was also determined that petitioners were not entitled to a bad debt deduction in 1958 in the amount of $575, representing the note of San Patricio Broadcasting Co., and that petitioners' gross income for 1959 should not include collections on this debt. Petitioners claim an overpayment of tax for each of the years 1958 and 1959 as a result of reporting the payments received under the "consulting contract" as ordinary income rather than as capital gains. Ultimate Facts
*334 The amount of $150,000 to be paid by Gay to petitioner under the consulting contract of May 24, 1958, was not a part of the purchase price of petitioner's stock in KITE, Inc., but was a payment for a covenant not to compete and for consulting services as provided in the contract. The note of San Patricio Broadcasting Co. in the amount of $575 has not been shown to be worthless in 1958. Opinion The first issue is whether the amounts received by petitioner in the taxable years under the consulting contract of May 24, 1958, were paid for consulting services and for a covenant not to compete, and thus are taxable as ordinary income, or were paid as a part of the purchase price for petitioner's stock in KITE, Inc., and thus are taxable as capital gain. As indicated in our Findings of Fact these payments were provided for in a separate contract which designated them as consideration for consulting services and a covenant not to compete, and petitioners reported them as ordinary income from consulting fees on their returns for the years involved, but now claim this was error. Petitioners impliedly recognize on brief, as they must, that if the amounts of $5,000 received in 1958 *335 and $15,000 received in 1959 represent compensation for consulting services rendered by petitioner, the amounts are ordinary income. And, if the amounts are payments for a covenant not to compete, they are still ordinary income and not capital gain. Cox v. Helvering, 71 F. 2d 987 (CADC 1934); Rodney B. Horton, 13 T.C. 143 (1949); Estate of Mildred K. Hyde, 42 B.T.A. 738 (1940). However, they argue that we must look behind the facade that Gay constructed to his tax advantage in obtaining petitioners' agreement to the contract containing their covenant not to compete and providing for their consulting services, and that if we view the matter realistically, we must conclude that Gay simply agreed to buy petitioner's stock at a certain price and that he artificially contrived to have a portion of the purchase price allocated to the "consulting fees" and the covenant not to compete. It is true, as petitioners maintain, that we must search the entire record to determine whether amounts paid by a purchaser to a seller do, in fact, represent payments for *336 a covenant not to compete. Richard Ullman, 29 T.C. 129 (1957), affd. 264 F. 2d 305 (C.A. 2, 1959); George H. Payne, 22 T.C. 526 (1954); Gazette Telegraph Co., 19 T.C. 692 (1953), affd. 209 F. 2d 926 (C.A. 10, 1954); Clarence Clark Hamlin Trust, 19 T.C. 718 (1953), affd. 209 F. 2d 761 (C.A. 10, 1954). See Emmette L. Barran, 39 T.C. 515 (1962) on appeal (C.A. 5, Mar. 4, 1963). It is similarly true that it is a factual question to be decided after a careful scrutiny of all the evidence whether amounts paid by the purchaser to the seller constitute compensation for the seller's promise to perform services or part of the consideration paid for capital assets. Jack Benny, 25 T.C. 197 (1955). However, it is to be kept in mind that the critical factor in determining whether amounts paid by the purchaser are to be allocated to a covenant not to compete is whether the agreement not to compete can be segregated from the agreement for the sale of the assets. Richard Ullman, supra; *337 Aaron Michaels, 12 T.C. 17 (1949). And if the parties themselves have contracted separately for the covenant, thereby indicating that the covenant was considered by them and negotiated as a separate item, a heavy burden rests upon the vendor to show that the consideration stated in their contract for an agreement not to compete was not what it purports to be. Richard Ullman, supra.In Emmette L. Barran, supra at 530, it was said: Since the facts established that the covenants not to compete were executed after arms'-length negotiations between the contracting parties, whereby the terms of the covenants and the payments thereunder were fixed and agreed to, we are entitled to assume that the covenants are meaningful. Under such circumstances strong proof must be adduced by the party seeking to overcome his covenant, Ullman v. Commissioner, 264 F. 2d 305, affirming 29 T.C. 129; Schulz v. Commissioner, 294 F. 2d 52, affirming 34 T.C. 235, and such proof is lacking in this case. It may be that petitioners now find themselves at a disadvantage taxwise, but in the absence of fraud it is not *338 ordinarily open to the parties to question their own contractual agreements. Rogers v. United States, 290 F. 2d 501. We recognize that there would be an income tax advantage to Gay in being able to deduct currently whatever payments he might make to petitioner and that he would thereby be motivated to seek a contract with provisions for petitioner's covenant not to compete and for his rendition of personal services. Whatever Gay might pay petitioner for his stock would, of course, not be deductible by Gay or by Gay, Inc., to which the contracts with petitioner were apparently assigned by Gay. Conversely, it would be to petitioner's advantage to bargain for a contract providing simply for the sale of his stock, or at least to make sure that any allocation of purchase price - if that price was in fact agreed upon at the outset - to a covenant not to compete be realistic and reflect the actual value of the covenant. So, as this Court has previously considered in Gazette Telegraph Co., supra, and Clarence Clark Hamlin Trust, supra, the interests of the parties resulting from their respective income tax advantages would be divergent. But this *339 very divergence of interests offers some assurance that the parties' final agreements are a reliable measure of the negotiations that preceded them. Ullman v. Commissioner, 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). Our review of those negotiations is limited to determining whether the covenant was bargained for as a separate item and to assure that the parties actually dealt with it; our ultimate concern is not the valuation of the covenant but merely to decide whether the parties in fact valued it as between themselves. Aaron Michaels, supra; Clarence Clark Hamlin Trust, supra.In other words, we cannot remake the parties' agreement for them; we can only determine whether their contracts realistically reflect their negotiations. Returning to the facts of the present case, we have had the benefit of the testimony of petitioner and of the broker, Landis, who was present during the negotiations with Gay on May 14 and 15, 1958, when petitioner's first agreement with Gay was arranged, but no testimony from Gay or anyone acting on his behalf was adduced. [4] We do know however that Gay deducted, for income tax *340 purposes, the amounts which he paid petitioner under the contract for petitioner's consulting services, and we can suppose Gay would view the transaction in a different light than does petitioner. But Gay's testimony as to the basic facts might well be the same as petitioner's, since petitioner candidly admits that Gay asked him if he would enter into a covenant not to compete and that he willingly agreed. Even viewing the facts most favorable to petitioner, who contends that the transaction was rigged as a "tax gimmick" by Gay, it is clear that petitioner wanted to sell his broadcasting business because of his bad health and that he felt that he could no longer actively manage his business as he had in the past. It is also clear that the brokers whom he contacted estimated the value of the business of KITE, Inc., to be $400,000-$450,000, after they had reviewed financial statements of the business. We do not know what these financial statements showed in their entirety, but it does appear from the evidence that the net worth of the business, according to the books of the corporation, was about *341 $74,000. The broadcasting license is not shown as an asset on the balance sheet and its value is not included in this figure for net worth. The brokers had not inspected the properties when they told petitioner that the value of the business was $400,000-$450,000, so we can assume that the variance between the estimated value and the net worth per the books was not due to appreciation in tangible assets. That means that the brokers' valuation was probably based to some extent on prior earnings of KITE, Inc., and to some extent on the goodwill established by petitioner's personal efforts in the past. However, petitioner would have had no direct interest in the goodwill of the corporation; see Richard Ullman, supra; yet he was personally acquainted with the station's customers and he had personally built up the clientele. Therefore, there was a definite reason why Gay, who was experienced in broadcasting but who had no organization in San Antonio, would want an agreement from petitioner that he would not enter into an AM radio broadcasting operation within the area for a number of years and that he and possibly Mary Balthrope as well would be available for consultation *342 on local operations, advertising, etc., during that period. Gay was told before he began bargaining with petitioner that petitioner was selling the business because of his health. But it must be borne in mind that petitioner leased the FM radio broadcasting facilities from KITE, Inc., after he had sold the stock and that he continued to maintain an office in San Antonio from which he broadly directed the operation of the FM station and a background music business, although active day-to-day management of these businesses was left to others. Therefore, there is reason to conclude that, as of the date of the sale, Gay could have expected competition and services from petitioner when he dealt with him at the initial conference of May 15, 1958. There is no evidence that either petitioner or Landis told Gay beforehand that petitioner would not, under any circumstances, engage in the broadcasting business in competition with the AM station, and they did not tell Gay that petitioner could not perform consulting and advisory services. Because petitioner had spent some 20 years in the business in San Antonio such services, particularly with respect to advertisers, could have been valuable *343 to a purchaser of the business. Several facts work in petitioner's favor. First, Gay placed a lump-sum value on the business; he offered, it seems, $400,000 for the business on the condition that $150,000 of the total would apply to a contract not to compete and to render consulting services. This might point to an artificial allocation of a single price for capital assets. Secondly, in the contract of May 24, 1958, providing that petitioners were not to compete with KITE-AM in the San Antonio area for 10 years and were to perform services for a total consideration of $150,000 payable in installments, it is provided: "Connie B. Gay realizes that the foregoing represents a very modest arrangement and that some further consideration should be provided. Accordingly, he further agrees that, if neither Charles W. nor Mary Virginia Balthrope should survive the term of this agreement, he will pay the remaining installments due hereunder to the estate of the last survivor but with the privilege of anticipating the balance due without penalty." This provision has the hollow ring of evidence calculated for use primarily in a tax controversy. The evidence indicates that Mary had not actively *344 participated in the operations of the business - although there is evidence that she did some telephone survey work for Gay after the business was sold. But the critical fact, as we see it, is that petitioner and Gay admittedly dealt for the agreement for petitioner's services and for his covenant not to compete. They dealt verbally for it as a separate item, and they included provision for it as a separate item in the agreement of May 15, 1958, and they executed a separate contract for it dated May 24, 1958. Petitioner took no steps to modify or amend the contract although he had ample opportunity to do so if he desired; and despite the fact that petitioner, having then been advised by his tax adviser that his retention of the net current assets of KITE, Inc., might be deemed a dividend to him for tax purposes, sought the supplemental agreement of August 5, 1958, but apparently made no effort to amend the consulting contract of May 24, 1958. Furthermore, petitioner's actions indicate recognition of the reality and validity of the consulting agreement. They rendered advice and services to Gay after the sale, apparently with no other compensation, up until the time Gay sold the *345 station. How valuable this advice may have been we are in no position to say, but in addition petitioners did not engage in the operation or ownership of an AM radio station in competition with KITE. Petitioners reported the income received under the consulting contract as ordinary income from consulting fees. While this does not preclude them from now claiming that the amounts should be taxed as capital gain, it does reflect their recognition of the fact, at the time the returns were prepared, that the contract meant what it said. Throughout petitioner's correspondence with Gay and his representatives and with his own attorneys subsequent to the sale, petitioner repeatedly referred to the amounts due him under the "consultant contract" as a separate item, and as late as May 22, 1961, in a letter to his attorney in Washington advising him of the amounts due on the two $75,000 notes under the sales contract and the balance due on the "consultancy contract," he pointed out that the "two notes bear 5% interest, the consulting contract of course bears no interest." The fact that the amounts due under the consultancy contract bore no interest supports the proposition that the payments under *346 that contract were to be made concurrent with the rendition of the services for which they were paid, and that petitioner recognized this. Petitioners' evidence tends to show only that a covenant not to compete and petitioner's personal services were not worth $150,000, and that petitioner was ignorant of the tax consequences of his agreement. But we are not ultimately concerned with the value of the contract, as we have previously observed, and the conceded fact remains that petitioner dealt at arm's length for the contract as an item to be segregated from the stock. We have taken into account petitioner's original ignorance of tax consequences, and we have assumed that Gay was acutely aware of them, but we are only to determine the course of the negotiations, and, regardless of the motivations of the parties in the negotiations, petitioner bargained for and got exactly what he agreed to. We are constrained to hold that petitioners have not proved that the contract for the covenant not to compete and for the rendition of personal services was so illusory that we must ignore it. Petitioner has not adduced that convincing evidence necessary to permit him to impeach his own agreement. *347 Petitioners rely heavily upon Ray H. Schulz, 34 T.C. 235 (1960), affd. 294 F. 2d 52 (C.A. 9, 1961), a case in which this Court determined on the particular facts involved that no portion of the price paid by a partnership to a retiring partner could be allocated to a covenant not to compete because the covenant was nonseverable from the goodwill inherent in the partnership. But it was emphasized that the retiring partner had a proprietary interest in the goodwill of the partnership and that the transaction did not involve a sale of stock by a stockholder who had no proprietary interest in the goodwill of the corporation as a going concern, a situation with which we are presently confronted. We believe this authority to be distinguishable, and we hold that no part of the payments received by petitioner under his covenant not to compete and his agreement to perform consulting services constitutes gain from the sale of capital assets. The second issue is whether petitioners may report the gain from the sale of KITE, Inc., stock on the installment method. Petitioners are entitled to avail themselves of the installment method only if, in 1958, they did not *348 receive from the purchaser payments in excess of 30 percent of the selling price of the stock. Sec. 453(b), I.R.C. 1954. [5]
*349 It follows from our conclusion on the first issue that, in deciding this issue, we must look to the sales contract of May 24, 1958, and to the supplemental contract of August 5, 1958, without regard to the consulting contract of May 24, 1958. In arriving at the selling price of the stock, we cannot, as petitioners would have us do, consider the $150,000 which Gay agreed to pay for the covenant not to compete and for consulting services. The two sales contracts, that of May 24, 1958, and the supplemental agreement of August 5, 1958, provided that Gay was to pay petitioner $292,000 for the shares of stock. $100,000 was to be paid in cash, and petitioner was to receive three notes, two in the amount of $75,000 each and one in the amount of $42,000 for the remainder. The amount of $42,000 represented the parties' estimate of the net current assets of KITE, Inc., included in which was petitioner's liability to the corporation in the amount of $8,407.11. But this amount of $42,000 was apparently based upon the parties' estimate of net current assets as of a date prior to the closing, and by early August, when the transfer was approved by the FCC, "net quick assets" of the earlier date *350 had been reduced by expenses of operating the stations until the date of closing. Gay did not agree that all of the expenses were proper; it seems that he took the position that some were incurred for petitioner personally, and he demanded some adjustment for them. Also, petitioner had made a pledge for a charitable contribution in the name of the corporation and Gay insisted that petitioner pay it personally. Further, one of the net current assets shown on the balance sheet of the corporation, which was the basis for the parties' negotiations, was a note in the amount of $575. After the closing of the sale, Gay demanded that petitioner purchase the note, apparently because it seemed to Gay to be worthless. In his original agreement with Gay, petitioner had warranted that the property of KITE, Inc., was free of encumbrances, but it was discovered that certain property owned by the corporation was subject to a mortgage securing a debt in the amount of $12,342.84. Petitioner agreed to pay this amount to the creditor. The disagreements of the parties were settled by petitioner's paying by separate checks in 1958, the amount of $8,407.11 which he owed the corporation; the amounts of *351 $2,508.62, $126.29, and $265.51 [6] for expenses incurred between the date of the original agreement for the sale of stock and the date of closing; the amounts of $575, representing the note payable to KITE, Inc., which Gay told petitioner was worthless; and the debt secured by the mortgage amounting to $12,342.84 in 1958. These checks were all made payable to either Connie B. Gay, or Connie B. Gay, Inc., but all of them were endorsed for deposit in the account of Connie B. Gay, Inc. Petitioner also paid in 1958 the charitable pledge of $1,000 by check made payable to Hospitals Building Fund, Inc. In 1958, Gay paid the sum of $20,000 in escrow to the brokers, from which they deducted their commission of $15,800 and remitted the balance of $4,200 to petitioners; $80,000 to petitioner in cash; $5,000 on the two notes totaling $150,000; and $4,000 on the note in the principal amount of $42,000. These payments made by Gay total $109,000, and *352 petitioner actually received $93,200 of that amount (less the brokers' commission). On the basis of the foregoing facts, respondent has determined that petitioners may not use the installment method because petitioner received from Gay in 1958 more than 30 percent of the selling price of the stock. Respondent computes the selling price of the stock as $279,657.16 ($292,000 less $12,342.84, the amount of the mortgage paid by petitioner), and the payments received by petitioner in 1958 as totaling $96,657.16 ($109,000, the total of cash payments on the installment notes, less $12,342.84, the amount of the mortgage on KITE, Inc., property). Petitioners' principal argument on brief is that the selling price of the stock was $442,000, less the amount of refunds which petitioner was required to make to Gay, totaling $16,818.26, and that petitioner received in 1958 total payments of $114,000 ($109,000 plus $5,000 paid under the consulting agreement), less the amount of the refunds, or $97,181.74. Our conclusion on the previous issue answers their contention as to the amount of the selling price. The refunds totaling $16,818.26 are comprised of the following items: (1) The mortgage paid *353 in the amount of $12,342.84; (2) expenses in the amounts of $126.29, $2,508.62, and $265.51; (3) the note receivable in the amount of $575; and (4) the charitable contribution in the amount of $1,000. Petitioners specifically state that no adjustment is to be made for the amount of $8,407.11 which petitioner owed KITE, Inc.[7] Also, we note that while there is no contention about the item on brief, [8] the brokers' commission does not serve to reduce the selling price or the amount of payments received by petitioner. See Wagegro Corp., 38 B.T.A. 1225 (1938); sec. 1.453-4(c), Income Tax Regs.
Therefore, even if we accept petitioners' *354 contention that the total amount of the refunds was a reduction of the payments which petitioner received in 1958 (which we do not pass on), it is apparent that we must hold for respondent on this issue. Using petitioners' computations, except for the gross selling price dictated by our previous holding, the selling price of the stock would be $292,000, less $16,818.26, of which 30 percent would be $82,554.52. The payments received by petitioner in 1958 were $109,000, less $16,818.26, or $92,181.74. Thus the total payment received in 1958 exceeded 30 percent of the selling price, and petitioners are precluded from employing the installment method. The final issue is concerned with whether petitioners are entitled to a bad debt deduction in 1958 for the note of the San Patricio Broadcasting Co. This note, in the amount of $575, was that previously referred to, which Gay demanded petitioner purchase from KITE, Inc. Petitioner acceded to Gay's demands and paid KITE, Inc., the sum of $575 on October 31, 1958, after which KITE, Inc., endorsed the note to petitioner. The note was paid and petitioner received the amount of $575 in 1959. It appears that he included the amount of the recovery *355 in gross income in 1959. The burden is of course upon petitioners to show that the note was worthless in 1958. They have not sustained this burden. There is just no competent evidence in the record to prove the worthlessness of this note. We note that respondent has excluded from petitioners' gross income for 1959 the amount of the recovery reported. We hold for respondent on this issue. Decision will be entered under Rule 50. Footnotes
1. The $27,000 received in 1959 was reported on petitioners' 1959 return as collections on the installment sale of KITE stock. It appears that through inadvertence the $9,000 received on the two notes in 1958 was not reported at all. In computing the gain on the sale of the stock on a schedule attached to the 1958 return, the collections per share were computed by dividing the amount of cash received on the downpayment only ($60,366.43 as hereinafter shown) by the 20,000 shares sold, without including in collections the $9,000 received on the above two notes from the date of closing to the end of the year.↩
2. Exhibits JJ and KK.↩
1. This was figure used as collections on 1958 return referred to in footnote 1.↩
3. The broadcasting license was not listed as an asset on the books of KITE.↩
4. There are indications that Gay was out of the country at the time of this trial.↩
5. SEC. 453. INSTALLMENT METHOD. (a) Dealers in Personal Property. Under regulations prescribed by the Secretary or his delegate, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price. (b) Sales of Realty and Casual Sales of Personalty. - (1) General rule. - Income from - (A) a sale or other disposition of real property, or (B) a casual sale or other casual disposition of personal property (other than property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year) for a price exceeding $1,000, may (under regulations prescribed by the Secretary or his delegate) be returned on the basis and in the manner prescribed in subsection (a). (2) Limitation. - Paragraph (1) shall apply - (A) In the case of a sale or other disposition during a taxable year beginning after December 31, 1953 (whether or not such taxable year ends after [August 16, 1954] the date of the enactment of this title), only if in the taxable year of the sale or other disposition - (i) there are no payments, or (ii) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price. (B) In the case of a sale or other disposition during a taxable year beginning before January 1, 1954, only if the income was (by reason of section 44(b) of the Internal Revenue Code of 1939) returnable on the basis and in the manner prescribed in section 44(a)↩ of such Code.
6. From the meager evidence, it appears that the sums of $126.29 and $265.51 were incurred for insurance premiums for an automobile and a boat which petitioner was entitled to buy from KITE, Inc., at book value under his agreements with Gay.↩
7. Petitioners state: "A controversy arose during the trial as to the $8,407.11 item * * * but since it developed same was in settlement of items claimed by Gay to be his personal obligations, together with the purchase of the boat [by petitioner from KITE, Inc.] * * * no claim is made that same was such type of repayment to Gay as would operate to reduce the sales price." ↩
8. On their return for 1958 it appears that petitioners did reduce selling price and amount received by the brokers' commission of $15,800.↩