THOMAS C. STEPHENS AND MARGARET N. STEPHENS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

TAYLOR A. STEPHENS AND JUDITH K. STEPHENS, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 2960–70, 2961–70.   Filed September 27, 1973.

*Louis E. Ackerson* and *Robert L. Ackerson,* for the petitioners.
*Christopher D. Rhodes,* for the respondent.

SCOTT, *Judge:* Respondent determined the following deficiencies in petitioners' Federal income tax:

| Docket No. | Petitioners | Year | Deficiencies |
|---|---|---|---|
| 2960–70 | Thomas C. and Margaret N. Stephens | 1967 | $32,028.37 |
| 2961–70 | Taylor A. and Judith K. Stephens | 1967 | 29,481.87 |

The issue for decision is whether petitioners received dividend income when their corporation, Our Own Deliveries, Inc., redeemed the stock of shareholder Joseph G. Thornbury, Jr., and, if so, the amount of the dividend income received.

FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Thomas C. Stephens and Margaret N. Stephens, husband and wife, who at the time of the filing of their petition in this case resided in Louisville, Ky., filed a joint Federal income tax return for the year 1967 with the district director of internal revenue at Louisville, Ky.

Taylor A. Stephens and Judith K. Stephens, husband and wife, who at the time of the filing of their petition in this case resided in Louisville, Ky., filed a joint Federal income tax return for the year 1967 with the district director of internal revenue at Louisville, Ky.

Our Own Deliveries, Inc., is a Kentucky corporation, formed in 1929. It engages in the business of motor transportation of local cartage, primarily consisting of residential deliveries of packages for department stores. Thomas C. Stephens, father of Taylor A. Stephens, acquired a one-third interest in the company in 1946. The remaining issued and outstanding stock was acquired equally by B. L. Shamburger and Thomas A. Ballantine. Shamburger was an attorney practicing in the city of Louisville. Ballantine's principal occupation was other than connected with the corporate entity, Our Own Deliveries, Inc. Thomas L. Stephens was president of Our Own Deliveries, Inc., and this was his full-time occupation.

In the early 1950's, Joseph G. Thornbury, Jr., acquired one-fourth of the issued and outstanding stock, so that from that date forward there were four equal shareholders. Thornbury was vice president and general manager, and his position in Our Own Deliveries, Inc., was his principal occupation during the time he was a shareholder. In 1959, Thomas C. Stephens transferred one-half of his shares to his son, Taylor A. Stephens, and Taylor A. Stephens has been active in the affairs of the business since about that date to the present time.

In May of 1951, the shareholders of Our Own Deliveries, Inc., executed an agreement whereby they agreed that if any shareholder wished to sell his stock the remaining shareholders had an option to purchase that stock for book value.

In 1965 or 1966, B. L. Shamburger and Thomas A. Ballantine decided that they wished to dispose of their interest in Our Own Deliveries, Inc. The shareholders discussed liquidating the corporation, but Thomas C. and Taylor A. Stephens and Thornbury wished to continue to operate the corporation. The stockholders decided that it would be preferable if only one of the parties was left in control of the corporation, since the Stephenses and Thornbury had previously had differences of opinion as to management of Our Own Deliveries, Inc. Neither the Stephenses nor Thornbury were able to agree who would continue the business. Accordingly, a bidding procedure was developed whereby the purchasing shareholder would be determined.

The minutes of a meeting held on September 26, 1967, reflect the details of this procedure as follows:

After a lengthy discussion, the Meeting was concluded with the general agreement that stockholders desiring to sell would tender to remaining stockholders an offer which would include amount desired as well as terms of sale, which offer would be rejected or accepted by stockholders, and, should more than one stockholder accept the offer, sealed bids would be submitted by the stockholders desiring to acquire the interests, and such stock would be sold to the highest bidder, and the final conditions of sale by one stockholder would prevail for the remaining retiring stockholders.

On November 17, 1967, Thomas C. and Taylor A. Stephens entered into a stock purchase and sale agreement with Joseph G. Thornbury, Jr. The agreement provided as follows:

THIS AGREEMENT, between THOMAS C. STEPHENS and TAYLOR A. STEPHENS, both of Louisville, Jefferson County, Kentucky (referred to jointly in this Agreement as "Stephens"), and JOSEPH G. THORNBURY, JR. of Louisville, Jefferson County, Kentucky (referred to in this Agreement as "Thornbury") ;

WITNESSETH:

1. Stephens and Thornbury will, and do hereby agree to bid for the one-fourth (¼th) of the issued and outstanding stock of Our Own Deliveries, Inc., owned by the other, such competitive bid to be made at a meeting of the Board of Directors, of Our Own Deliveries, Inc. to be held at 3 P.M., E.S.T., on November 28, 1967, in the offices of B. L. Shamburger, Kentucky Home Life Building, Louisville, Kentucky. Stephens and Thornbury will each submit to the other a sealed bid for the price for which the offeror will buy the stock of the other, and such offer will be accompanied by a deposit of five (5%) percent of the offered purchase price. The high bidder will purchase all of the stock of the other party and will pay the balance of the purchase price on or before December 6, 1967.

2. If the high bidder fails to pay the balance when due, (a) the deposit may be retained by the other party as liquidated damages for the breach of the purchase contract, and (b) the low bidder will then pay the defaulting buyer a deposit of five (5%) percent of the low bidder's offered price, and will pay the balance of the low bidder's offered price not later than December 16, 1967.

3. The bids by Thornbury and Stephens will be not less than that amount of money for which Thomas A. Ballantine and B. L. Shamburger have each offered to sell their respective one-fourth (¼th) stock interest in Our Own Deliveries, Inc. to the corporation.

4. The selling stockholder agrees to resign, not later than December 18, 1967, as an officer and director of the corporation, and to endorse his stock in the corporation to the purchaser or his designee.

5. If bids in an identical amount are submitted by Stephens and Thornbury on November 28, 1967, each will submit a new bid not later than three (3) days after November 28, 1967, at a meeting of the Board of Directors to be held at such time and place as may be agreed upon by the parties. The time for payment and performance as hereinabove specified shall be extended by three (3) days with respect to each date for payment and performance.

At a meeting of the board, on November 17, 1967, Thomas A. Ballantine and B. L. Shamburger submitted identical proposals to Our Own Deliveries, Inc. The proposals provided as follows:

To: OUR OWN DELIVERIES, INC.

1. In accordance with all terms, provisions and conditions of this offer, I hereby offer to sell to you all of my capital stock in Our Own Deliveries, Inc., for the total sum of Seventy-One Thousand Five Hundred Dollars ($71,500.00), except as modified by Paragraph 2 hereof.

2. This offer is conditioned upon the existence of an Agreement among Joseph G. Thornbury, Jr., Thomas C. Stephens and Taylor A. Stephens under the terms of which Thomas C. Stephens and Taylor A. Stephens on the one hand and Joseph G. Thornbury, Jr. on the other hand will, through competitive bidding, become the owners or owner of all the capital stock in Our Own Deliveries, Inc., owned by the other party or parties. If, under such agreement, the price paid by the successful bidder shall exceed the sum of Seventy-One Thousand Five Hundred Dollars ($71,500.00) for a one-fourth (¼th) interest in Our Own Deliveries, Inc., then and in that event the price at which such stock is acquired by the successful bidder shall be the price of my offer to sell contained in paragraph 1 hereof.

3. Upon delivery of my Certificate of Stock pursuant to any acceptance of this offer Our Own Deliveries, Inc., shall pay me ten percent (10%) of the purchase price with the balance of such purchase price payable as follows: Fifteen percent (15%) of the purchase price to be paid on December 1, 1967; fifty percent (50%) of the purchase price to be paid on January 10, 1968, together with interest at the rate of Six percent (6%) per annum; and the balance of the unpaid purchase price to be paid on December 1, 1968, together with interest thereon at the rate of Six percent (6%) per annum. During the period that any portion of the purchase price is not paid, the corporation will not: (1) impair, or permit the impairment of, the capital of the corporation; (2) increase the salary or salaries of any officers of the corporation; (3) pay any dividends on any of the stock of the corporation; or (4) in any way change the ordinary course of operation of the business of the corporation. Upon request by me, the corporation will cause to be furnished to me monthly operating statements of the corporation and balance sheets or interim balance sheets of the corporation. Upon default in the payment of any of the aforesaid installments or failure to observe the conditions hereof, any and all remaining balances due hereunder shall become due and payable.

4. The acceptance of this offer by the corporation shall not be binding on the said corporation unless prior to any payment of the purchase price I have resigned as an officer and director of the corporation and have in every respect severed my interest in and relationship with Our Own Deliveries, Inc.

At the same meeting, Thomas A. Ballantine and B. L. Shamburger presented their resignations as directors and officers of the corporation. The resignations were accepted. Shamburger endorsed his stock certificates to Our Own Deliveries, Inc., on November 17 and Ballantine endorsed his stock certificates to the corporation on November 20, 1967. They each received an initial payment of $7,150 from the corporation on November 20.

In anticipation of the submission of the aforementioned bids, petitioner Thomas C. Stephens met with John C. Nichols, a representative of the Citizens Fidelity Bank & Trust Co. of Louisville. Petitioner received an oral commitment from Nichols that if the Stephenses were the successful bidders for the stock of Our Own Deliveries, Inc., the bank would loan $90,000 to the corporation, the loan to be personally guaranteed by the Stephenses. Thomas C. Stephens told Nichols that these funds were necessary to enable the corporation to buy back some

of its outstanding stock. The loan was actually made to the corporation on November 29, 1967, and was secured by a chattel mortgage on the corporate property and personally guaranteed by the Stephenses. Both Ballantine and Shamburger were aware that the Stephenses did not have the personal financial means to purchase Thornbury's stock except by use of their interest in the corporation if they were the successful bidders. They expected the Stephenses, if they were the successful bidders, to raise the money to pay Thornbury through the corporation.

A special meeting of the board of directors of Our Own Deliveries, Inc., was held on November 28, 1967. The minutes of this meeting recited that "there were present Thomas C. Stephens and Joseph G. Thornbury, Jr., constituting a quorum of Directors, and by invitation B. L. Shamburger, Thomas A. Ballantine and Mr. Thornbury's attorney."

The Stephenses and Joseph G. Thornbury, Jr., exchanged sealed bids for the purchase of each other's stock. The bid made by Joseph G. Thornbury, Jr., was as follows:

I agree to pay THOMAS C. STEPHENS and TAYLOR A. STEPHENS the sum of $73,684.08—SEVENTY THREE THOUSAND SIX HUNDRED EIGHTY-FOUR and 08/100 for their combined one-fourth (¼th) interest in OUR OWN DELIVERIES, which consists of 33½ shares of stock in OUR OWN DELIVERIES, INC.

The bid made by the Stephenses to Joseph G. Thornbury, Jr., was as follows:

TO: JOSEPH G. THORNBURY, JR.

In accordance with all terms and conditions of Stock Purchase and Sale Agreement between Thomas C. Stephens, Taylor A. Stephens and Joseph G. Thornbury, Jr., dated November 17, 1967, we, the undersigned, offer to purchase for ourselves or our designee all (33½ Shares) of the capital stock of Our Own Deliveries, Inc., issued in your name, for the total sum of $78,216.06.

A good faith deposit of $3,910.81, 5% of the total offering price shown above, is attached in the form of a check drawn in your favor. The remainder of the total purchase price will be paid upon surrender of your stock certificates at a time selected by the undersigned parties on or before December 6, 1967.

At this meeting, the competitive bids submitted by both Thornbury and the Stephenses were read into the minutes, and the following resolution was unanimously adopted:

RESOLVED, that the bid of Thomas C. Stephens and Taylor A. Stephens of $78,216.06 be accepted as the total sum to be paid to each of the following for their respective 33½ shares of stock in Our Own Deliveries, Inc.: Joseph G. Thornbury, Jr., B. L. Shamburger and Thomas A. Ballantine.

The good-faith deposit in the form of a personal check of Thomas C. Stephens in favor of Thornbury in the amount of $3,910.81 was accepted. The corporation later reimbursed Thomas C. Stephens for this deposit.

The minutes of a special meeting of the stockholders of Our Own Deliveries, Inc., on November 30, 1967, recited that the stock of Thomas A. Ballantine, B. L. Shamburger, and Joseph G. Thornbury, Jr., had been reacquired by the company. New directors were therefore elected. On that date, the corporation paid to Thornbury the balance of the purchase price for his stock. Thornbury endorsed his stock to the corporation.

The retained earnings of Our Own Deliveries, Inc., immediately preceding the transactions involving Thomas A. Ballantine, B. L. Shamburger, and Joseph G. Thornbury, Jr., whereby they sold or disposed of their 33½ shares of capital stock in Our Own Deliveries, Inc., were as follows:

| | |
|---|---|
| Earned surplus | $96, 420. 83 |
| Surplus reserved for replacement of equipment | 32, 597. 54 |
| Total | 129, 018. 37 |

The amount shown as retained earnings has remained unchanged since December 31, 1957. Our Own Deliveries, Inc., has since that date operated as a subchapter S corporation.

The capital stock issued by Our Own Deliveries, Inc., had an initial or capital stock value of $13,400. The corporation had a paid-in or capital surplus as of January 1, 1967, of $12,018.72, resulting in a total capital and paid-in surplus immediately prior to the transactions in question of $25,418.72. The corporate balance sheet of the corporation as of the end of 1967 shows, in part, the following:

| Liabilities and capital | Beginning of taxable year | End of taxable year |
|---|---|---|
| Capital stock | $13, 400. 00 | $13, 400. 00 |
| Paid-in or capital surplus | 12, 018. 72 | 12, 018. 72 |
| Retained earnings—appropriated | | |
| Retained earnings—unappropriated | 210, 449. 22 | 233, 243. 19 |
| Shareholders' undistributed taxable income | 25, 384. 98 | 8, 086. 46 |
| Less cost of treasury stock | | (234, 648. 18 ) |

The U.S. Small Business Corporation Income Tax Return (Form 1120S) filed by Our Own Deliveries, Inc., for 1967 shows certain items of accrued expenses among the current liabilities and shows the following "Reconciliation of Surplus":

| | Earned surplus | Shareholders' undistributed taxable income | Total |
|---|---|---|---|
| Balance Dec. 31, 1966 | $210, 449 .22 | $25, 384 .98 | $235, 834 .20 |
| 1967 taxable income | | 42, 669 .72 | 42, 669 .72 |
| Excess of book income over taxable income | 3, 755 .23 | | 3, 755 .23 |
| Cash distribution to stockholders | | (40, 929 .50) | (40, 929 .50) |
| Undistributed taxable income allocable to shareholders whose stock was redeemed in 1967 | 19, 038 .74 | (19, 038 .74) | |
| Balance Dec. 31, 1967 | 233, 243 .19 | 8, 086 .46 | 241, 329 .65 |

Our Own Deliveries, Inc., paid B. L. Shamburger for his stock by checks dated on the following dates and in the following amounts: November 20, 1967, $7,150; November 30, 1967, $10,725; December 4, 1967, $1,679.01; January 10, 1968, $39,429.47; September 27, 1968, $9,054.02; and December 10, 1968, $11,630.60.

Our Own Deliveries, Inc., paid Thomas A. Ballantine for his stock by checks dated on the following dates and in the following amounts: November 20, 1967, $7,150; November 30, 1967, $10,725; December 4, 1967, $1,679.01; January 10, 1968, $39,429.47; September 27, 1968, $9,054.02; and December 10, 1968, $11,630.60.

None of the petitioners reported the acquisition by the corporation of the stock of any of the three shareholders as having any tax consequences to them.

Respondent in his notice of deficiency determined that the stock purchases of all three shareholders resulted in a taxable dividend to petitioners from Our Own Deliveries, Inc. At the trial respondent conceded that the transaction involving the selling shareholders, Shamburger and Ballantine, was a transaction which did not result in a dividend to the petitioners, leaving only the issue of whether petitioners received a dividend as a result of payment by the corporation for the acquisition of the stock of Joseph G. Thornbury, Jr.

## OPINION

Both parties recognize that if petitioners individually were legally obligated to purchase Thornbury's stock, so that the payment for that stock by the corporation relieved petitioners of a binding obligation, petitioners have received a distribution which may be essentially equivalent to a dividend. The amount, if any, of such distribution which would be taxable income to them under sections 301 and 316 of the Internal Revenue Code of 1954 [1] depends on the amount of previously taxed earnings applicable to the distribution and the amount

---

[1] All section references are to the Internal Revenue Code of 1954.

SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

* * * * * * *

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—
(1) AMOUNT CONSTITUTING DIVIDEND. That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—
(1) out of its earnings and profits accumulated after February 28, 1913, or
(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the

of the corporation's earnings and profits available for dividend distribution.

Petitioners contend that they were never personally obligated to purchase Thornbury's stock but that should we determine otherwise they received no taxable dividend since the corporation, Our Own Deliveries, Inc., exhausted its retained earnings when it redeemed the stock of Shamburger and Ballantine. Petitioners contend that the corporation had no retained earnings on November 30, 1967, out of which it could have paid a dividend to petitioners.

The question of whether a redemption of stock owned by one shareholder is income to the remaining shareholders has been the subject of much litigation. The courts have uniformly held that where a corporation redeems stock which its remaining shareholder was obligated to buy, the remaining shareholder has received a taxable dividend in the amount of the redemption price to the extent that such price does not exceed the corporate earnings and profits available for payment of dividends. *Sullivan* v. *United States*, 363 F. 2d 724 (C.A. 8, 1966), certiorari denied 387 U.S. 905 (1967) ; *Wall* v. *United States*, 164 F. 2d 462 (C.A. 4, 1947).

Respondent contends that the Stephenses personally incurred a legal obligation to purchase the stock owned by Thornbury, which obligation was thereafter discharged by the corporation thereby relieving the Stephenses of their obligation to Thornbury.

We conclude from the documentary evidence and the testimony of the witnesses that the Stephenses incurred a personal obligation to purchase Thornbury's stock. Thornbury and the Stephenses were to bid against each other for the purchase of the stock. The corporate minutes of September 26, 1967, contain the following statement:

After a lengthy discussion, the Meeting was concluded with the general agreement that stockholders desiring to sell would tender *to remaining stockholders* an offer which would include amount desired as well as terms of sale, which offer would be rejected or accepted *by stockholders*, and, should more than one stockholder accept the offer, sealed bids would be submitted by *the stockholders desiring to acquire the interests*, and such stock would be sold to the highest bidder, and the final conditions of sale by one stockholder would prevail for the remaining retiring stockholders. [Emphasis supplied.]

The stock purchase and sale agreement between the Stephenses and Thornbury contains the following:

1. *Stephens and Thornbury* will, and do hereby agree to bid for the one-fourth

taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

(¼th) of the issued and outstanding stock of Our Own Deliveries, Inc. owned by the other, * * *. *Stephens and Thornbury will each submit to the other a sealed bid for the price for which the offeror will buy the stock of the other, and such offer will be accompanied by a deposit of five (5%) percent of the offered pur-chase price. The high bidder will purchase all of the stock of the other party and will pay the balance of the purchase price on or before December 6, 1967.* [Emphasis supplied.]

The bidding system was again mentioned in the stock offer by Ballantine and Shamburger to the corporation:

2. This offer is conditioned upon the existence of an Agreement among Joseph G. Thornbury, Jr., Thomas C. Stephens and Taylor A. Stephens under the terms of which *Thomas C. Stephens and Taylor A. Stephens on the one hand and Joseph G. Thornbury, Jr. on the other hand will, through competitive bidding, become the owners or owner of all the capital stock in Our Own Deliveries, Inc.,* owned by the other party or parties. [Emphasis supplied.]

The bid made by the Stephenses to Thornbury was as follows:

We, the undersigned, offer to purchase for ourselves or our designee all (33½ Shares) of the capital stock of Our Own Deliveries, Inc., issued in your name, for the total sum of $78,216.06.

The above documents show that the Stephenses were personally bidding for Thornbury's stock. There is no evidence that either Thornbury or the Stephenses were acting on behalf of the corporation. Cf. *Richard B. Bennett,* 58 T.C. 381 (1972). Thornbury testified that he was bidding personally for the Stephenses' stock, and, had his bid been the higher, he would have bought their stock with personal funds. It was his understanding that Thomas C. and Taylor A. Stephens were personally bidding against him. His testimony showed that he considered the Stephenses personally liable to pay to him the bid price. Moreover, petitioners acknowledged that they knew Thornbury was bidding personally, and that they would have held Thornbury personally liable for his bid price if Thornbury's bid had been successful.

In order for a taxpayer to overcome clear and unambiguous language in documents relating to a transaction to which he is a party, he must show by strong proof that the true agreement of the parties differs from the language of the written agreement. *Ullman* v. *Commissioner,* 264 F. 2d 305 (C.A. 2, 1959), affirming 29 T.C. 129 (1957). Petitioners have not carried this burden but rather the other evidence of record supports the conclusion to be drawn from the documents that petitioners personally bound themselves to buy Thornbury's stock, as both the stock purchase and sales agreement and the bids clearly indicate.

Respondent has pointed out that the situation at bar closely resembles the facts in the leading case of *Wall* v. *United States,* 164 F. 2d 462 (C.A. 4, 1947). In *Wall,* the taxpayer in the first transaction ac-

quired stock, paid an amount of cash, and obligated himself personally to pay additional amounts. In a subsequent, separate transaction the corporation paid the notes. Similarly here, the Stephenses bid for Thornbury's stock on November 28, and, being the successful bidders, paid Thornbury the agreed downpayment with a personal check. The corporation, on November 30, paid the balance of the purchase price to Thornbury, and, in the subsequent transaction, satisfied the personal obligation that the petitioners had already incurred.

The numerous cases cited by petitioner are factually distinguishable. In most of those cases, the taxpayer never became personally liable to buy the stock which was later redeemed by the corporation and therefore had no obligation which the corporation paid.

Petitioners cite *Frank Ciaio*, 47 T.C. 447 (1967) and *Fox* v. *Harrison*, 145 F. 2d 521 (C.A. 7, 1944), in support of their contention that they were acting as agents for the corporation. These cases are likewise distinguishable on their facts from the instant case. Petitioners personally bid for Thornbury's stock and there is no evidence that they were acting on behalf of the corporation in bidding for that stock or that they had any authority to act for the corporation. Petitioners' intent to so act, if in fact they did have such an intent, in and of itself is not sufficient to make them agents of the corporation.

Petitioners further assert that neither they nor Thornbury could have submitted a bid on behalf of the corporation and that it was necessary that the procedure be carried out in a manner so that the Stephenses bid in their own name for Thornbury's stock. If this were in fact the situation it would merely underline the personal obligation taken on by the Stephenses. However, there is nothing in the record to show that a bidding plan could not have been arranged so that neither the Stephenses nor Thornbury would incur a personal obligation to purchase the other's stock. Thornbury's testimony indicates that each of the bidding parties desired to create a personal liability for the other's stock. The bidding plan and the bids clearly obligated the Stephenses to purchase Thornbury's stock. The documents involved were examined and revised by counsel. In our view these documents accurately reflect the intentions of the parties.

Petitioners contend that the fact that the funds used to pay Thornbury were borrowed by the corporation indicates that the Stephenses did not intend to be held personally liable. We know that Thomas C. Stephens approached an officer of the bank prior to the time the bid was opened. This merely indicates that petitioners might have contemplated a method whereby the corporation would relieve them of their personal liability.

We conclude that the documents involved and the testimony of the parties show that the Stephenses incurred an unconditional obligation

to purchase Thornbury's stock prior to the time the corporation redeemed Thornbury's stock. Therefore, this case falls within the line of authority which holds that when the corporation relieves a shareholder of a personal obligation to purchase a retiring shareholder's stock, the remaining shareholder has received dividend income to the extent of the price paid if the earnings and profits of the corporation are sufficient to permit of such a dividend. *Louis H. Zipp*, 28 T.C. 314 (1957) affirmed per curiam 259 F. 2d 119 (C.A. 6, 1958), certiorari denied 359 U.S. 934 (1959).

Petitioners, in the alternative, contend that since Our Own Deliveries, Inc., has redeemed the stock of Ballantine and Shamburger on November 17, 1967, the corporation had no earnings and profits out of which it could pay a dividend on November 30, 1967. The parties have stipulated that the "retained earnings" of the corporation as of December 31, 1957, immediately prior to Our Own Deliveries, Inc., becoming a subchapter S corporation were $129,018.37, composed of $96,420.83 of earned surplus and $32,597.54 of surplus reserved for replacement of equipment. The parties further stipulated that the "retained earnings" have remained unchanged since December 31, 1957, when Our Own Deliveries, Inc., began operation as a subchapter S corporation.

Respondent in his brief, however, points out that Our Own Deliveries, Inc.'s balance sheet shows "retained earnings" or "earned surplus" as of December 31, 1966, of $210,449.22 and as of December 31, 1967, of $233,243.19. Respondent further points out that the increase in the "earned surplus" on the balance sheet appears to consist of amounts which should be carried by Our Own Deliveries, Inc., as shareholders' undistributed income since after Our Own Deliveries, Inc., became a subchapter S corporation all of its income was taxed to its shareholders and it no longer had earned surplus which had not been so taxed and which might therefore be available for distribution as a taxable dividend.

From the portions of Our Own Deliveries, Inc.'s balance sheet and reconciliation of surplus which we have set forth in our findings, it appears that the excess of retained earnings or earned surplus shown by Our Own Deliveries, Inc., on its 1967 balance sheet over the $129,018.37 of retained earnings as of December 31, 1957, is in fact composed of income which has been taxed to the shareholders but not actually distributed to those shareholders.

Petitioners did not indicate in their petition or at the trial that they questioned the availability of earnings and profits to cover the amount of the payment by the corporation to Thornbury should we decide that the payment by the corporation constituted a dividend to petitioners. Respondent does not question petitioners' raising of this

issue in their brief but does question their failure to consider the effect of the undistributed income on the computation of the earnings and profits available for the payment of dividends. In view of our conclusion as explained later herein that the total distributions actually made to Ballantine and Shamburger prior to the payment to Thornbury for his stock were not sufficient to reduce the earnings and profits of Our Own Deliveries, Inc., below the $78,216.06 paid by the corporation to discharge the Stephenses' obligations to Thornbury, we need not decide to what extent Our Own Deliveries, Inc., had undistributed income which had been taxed to the stockholders in accordance with the provisions of subchapter S or how this undistributed taxable income should be allocated to the redemption of the stock of Ballantine and Shamburger.

Respondent's primary position is that the transaction involving the redemption by Our Own Deliveries, Inc., of Ballantine's and Shamburger's stock occurred simultaneously with the payment of Our Own Deliveries, Inc., for the stock of Thornbury which petitioners had agreed to purchase. In our view respondent has misinterpreted the facts in this respect. Although the price set for the stock of Ballantine and Shamburger was a minimum price subject to being raised after the price to be paid by petitioners for Thornbury's stock or Thornbury for petitioners' stock was set, in our view Our Own Deliveries, Inc., had agreed to and taken on the obligation to redeem the stock of Ballantine and Shamburger for at least this minimum price on November 17, 1967. Therefore, in our view the agreement to redeem the stock of Ballantine and Shamburger preceded petitioners' agreement to purchase Thornbury's stock and the payment by Our Own Deliveries, Inc., of the obligation taken on by petitioners for the purchase of Thornbury's stock. We therefore consider it necessary to determine to what extent, if any, the earnings and profits of Our Own Deliveries, Inc., should be considered as reduced by the agreement of November 17, 1967, of that corporation to redeem the stock of Ballantine and Shamburger for the purpose of determining the available earnings and profits for payment of a dividend to petitioners on November 30, 1967, when Our Own Deliveries, Inc., paid in full petitioners' obligation to Thornbury in connection with their purchase of Thornbury's stock.

The effect of the agreements on the corporation's retained earnings account is governed by section 312, titled "Effect on Earnings and Profits." Section 312(a) states the general rule that "on the distribution of property by a corporation with respect to its stock, the earnings and profits of the corporation (to the extent thereof) shall be decreased by the sum of (1) the amount of money, (2) the principal amount of the obligations of such corporation, and (3) the adjusted

basis of the other property, so distributed." In addition, in the case of certain redemptions to which section 302(a) or 303 applies (as in our case), "the part of such distribution which is properly chargeable to capital account shall not be treated as a distribution of earnings and profits." Sec. 312(e).

The question before us, therefore, is to what extent Our Own Deliveries, Inc., distributed either its "obligations" or other property prior to November 30, 1967, when it paid Thornbury the amount of $74,305.25. This requires us to decide whether or not the contractual obligation of the November 17, 1967, agreements should be regarded as a distribution of "obligations of such corporation" or property on that day, so that earnings and profits are reduced by whatever portion of the face amount of the $156,432.12 redemption price would have been charged against earnings and profits had the distribution been in cash prior to the November 30 payment to Thornbury.

Section 312(a)(2) and the accompanying regulations clearly provide that a corporation may distribute its own obligations in lieu of cash or property with an identical reduction in earnings and profits. However, a contractual obligation to pay an amount with respect to corporate stock is not ordinarily a distribution of an obligation of the corporation or other property. *Allan S. Vinnell*, 52 T.C. 934, 944 (1969). Whether a contractual obligation is to be considered an "obligation" of the corporation or other property within the meaning of section 312(a) is a question of fact to be determined from the provisions of the contract and other evidence of record. In examining the November 17 agreements and the record before us, we conclude that the contractual obligation here involved did not constitute the distribution of an obligation of the corporation so as to reduce earnings and profits on that date. The agreements themselves were merely written evidence of the obligation of Our Own Deliveries, Inc., to pay Ballantine and Shamburger $156,432.12 over a period of time, and there is no indication in the record that they were intended by the parties to represent payment of that obligation. Although the agreements provide for payment of interest and on the face prohibited the corporation from distributing its cash or property prior to payment in full to Shamburger and Ballantine, they do not provide for, nor did Shamburger and Ballantine request, any security for the debt. Moreover, Shamburger and Ballantine were both aware of the corporation's intention to borrow money from a bank to pay Thornbury, and they knowingly allowed the bank to take chattel mortgages on all the corporate assets, with the result that their rights were subordinated to those of the bank. These factors lead us to conclude that the obligation to Shamburger and Ballantine resembled more an open-account indebtedness than a bona fide obligation representing payment on the

date of the agreement. In addition, petitioners did not show that the corporation took steps to segregate a portion of its earnings and profits on the corporate books, so as to transfer control of the money to the payees. Cf. *Samuel Goldwyn*, 9 T.C. 510 (1947), affd. 175 F. 2d 641 (C.A. 9, 1949.) Thus, we do not find that Shamburger and Ballantine ·constructively received payment in the face amount of the obligation owed them.

Based on all the facts here present, we conclude that the cash payment of each sum due under the November 17 agreements constituted a separate distribution of property, and that earnings and profits of Our Own Deliveries, Inc., were reduced prior to the payment in full to Thornbury only by the amount of the cash payments to Ballantine and Shamburger which does not represent a return of capital under section 312(e). In so holding, we find that Our Own Deliveries, Inc., had a sufficient amount of earnings and profits remaining to enable payment of a dividend to petitioners of $74,305.25 on November 30 and $3,910.81 on December 1, 1967.[2]

In his deficiency notices in this case, respondent determined that any amounts found to be distributions to petitioners will be considered distributions of previously taxed income to the extent of their net shares thereof apparently for the reason that these net shares would not be considered dividends. Sec. 1375(d)(1). It is not clear the extent to which, if any, respondent intended to modify the amounts determined to be such net shares in the deficiency notices when he made his concession concerning the redemptions of stock from Shamburger and Ballantine. In view of our conclusion in this case, this matter should be resolved in the Rule 50 computation.

Because of the concessions made by respondent,

*Decisions will be entered under Rule 50.*

---

[2] In view of this conclusion, it is unnecessary to pass on the validity of respondent's Rev. Rul. 70-531, 1970-2 C.B. 76, as applied to this case. This ruling does not specifically deal with undistributed taxable income of a subchapter S corporation. However, under this ruling it is clear here that not over 50 percent of the earnings and profits of Our Own Deliveries, Inc., would be allocated to the 50 percent of the stock owned by Ballantine and Shamburger which was redeemed. See *Herbert Enoch,* 57 T.C. 781, 801 (1972), in which we refused to follow the approach taken in Rev. Rul. 70-531 as to amounts of redemption price charged to the "capital account" under somewhat similar circumstances.