PAULINE R. GROW, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; JOHN GROW and ARUNEE GROW, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Grow v. Commissioner
Docket Nos. 1972-82, 1973-82.
United States Tax Court
T.C. Memo 1984-64; 1984 Tax Ct. Memo LEXIS 610; 47 T.C.M. (CCH) 1057; T.C.M. (RIA) 84064; February 8, 1984. *610 Petitioners sold the assets of their wholly-owned subchapter S corporation to a buyer pursuant to an agreement of sale that allocated $297,000 of the $330,000 total purchase price to certain property subject to recapture under section 1245. Petitioners presented strong proof that the intent of the contracting parties and the economic reality of the transaction require a reallocation by the Court of a portion of the $297,000. Held: Allocation made to non-section 1245 property. Richard D. Hughes and Paul J. Corsaro, for the petitioners. Reid M. Huey, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined deficiencies *612 of $91,826.58 in Petitioner Pauline R. Grow's 1978 Federal income taxes and of $1,507 in Petitioners John Grow and Arunee Grow's 1978 Federal income taxes. After concessions by petitioners, the issue remaining for decision in these consolidated cases is how much of the purchase price received by petitioners' wholly-owned subchapter S corporation from the sale of some of its assets is allocable to section 1245[1] property. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner Pauline R. Grow (Pauline) resided in Muncie, Indiana, during the year in issue and when her petition herein was filed. Petitioners John Grow (John) and Arunee Grow are husband and wife and resided in Cincinnati, Obio, during the year in issue and when their petition herein was filed. John is Pauline's son. In 1962, Gerald S. Grow, Pauline's husband and John's father, incorporated Miracle Water of Indiana, Inc., (Miracle Water *613 or the corporation), and caused all of its stock, 20 shares, to be issued to himself. An election to be taxed under the provisions of subchapter S was filed on behalf of Miracle Water on January 1, 1965, and was still in effect in 1978. The Corporation was a calendar year taxpayer. Miracle Water was located in Muncie, Indiana, and its principal business activity was the sale, rental, and servicing of "Miracle Water" brand water softening units in the Muncie area. The corporation employed sales personnel who secured rental accounts for Miracle Water, primarily with residential users. The customer paid a one-time fee for the installation of the water softening unit; this fee varied depending on the amount of labor and materials expended. If the customer's home already had the plumbing for water softening service, there was no charge for the installation of a unit. Each customer paid a monthly rental to Miracle Water for water softening service, usually pursuant to a written contract but on a month-to-month basis. Miracle Water had a policy of never raising a customer's rental from the initial amount charged. As a result, Miracle Water often underpriced its competitors. Over *614 the years, Miracle Water's rental income rose steadily as follows: 1967
$32,167
1968
45,039
1969
54,728
1970
67,174
1971
80,459
1972
98,552
1973
110,962
1974
123,444
1975
136,259
1976
151,258
1977
173,566
1978 (through Nov. 17)
165,075
The units owned and serviced by Miracle Water were constructed as a tank containing resin inside of another tank. The tanks were guaranteed by the manufacturer for 5 years, and the resin was guaranteed for 1 year. Water circulating through the unit was softened when filtered by the resin. The resin was thus the key component of the unit; the size of the unit, e.g., 15,000 grain, 20,000 grain, or 40,000 grain referred to the amount of resin it contained.The resin could be consumed in less than 3 years or might last as long as 20 years, depending upon the quality of the water passing through it. A unit could be rebuilt and its usefulness prolonged by replacing the resin, but rebuilding was not always cost-efficient because parts were often inadvertently broken during the rebuilding process. On the average, Miracle Water rebuilt 10 units per week and returned them to service in homes. By 1976, approximately *615 50 percent of the units then in service were rebuilt units. In 1978, approximately 90 percent of the units owned by Miracle Water were of the 20,000 grain size, and the remaining units were of the 40,000 grain size. As a teenager, John worked for Miracle Water part-time during the school year and full-time during the summer. Initially, John performed maintenance chores around the office. After he began to drive, he delivered salt to customers, and, while in college, he worked as a company salesman. In 1970, John's father gave him one share of stock in Miracle Water. In 1973, Gerald Grow died. John then undertook the management of the corporation, although he was enrolled as a full-time graduate student at the University of Cincinnati. During the school year, John communted to Muncie 1 to 3 days a week to oversee the business, which was managed on a day-to-day basis by long-time employees of the corporation. Pauline was in the office almost every day but confined her activities to waiting on customers and monitoring employee performance. The probate of Gerald's estate was completed in 1975, and Gerald's remaining 19 shares of Miracle Water stock were distributed to Pauline. *616 Petitioners then decided to sell Miracle Water. Pauline's cousin, Joe Holaday (Holaday), a local banker, agreed to help them sell their business. The various assets of the business, including the rental accounts, were valued, and the desired terms of sale were determined. Petitioners did not want to finance any part of the purchase, so a few early overtures from local people were rejected. In the spring of 1978, an advertisement in the Wall Street Journal produced a prospective buyer who, after negotiations, agreed to purchase all outstanding shares of stock of Miracle Water for $330,000. A formal agreement was never reached, however, and, in July of 1978, the proposed sale was cancelled. Holaday then convinced John to consider selling the business to John Oxley (Oxley), owner of Oxley Servisoft Water Conditioning (Servisoft Water), who had previously expressed interest in buying the business. Shortly thereafter, Oxley agreed in principal to buy Miracle Water for $330,000, the price requested by petitioners. Servisoft Water was also engaged in the sale, rental, and servicing of residential water softeners in the Muncie area and handled "Service Soft" and "Miracle Water" *617 units, which were both manufactured by Water Refining Company and were basically the same product. Miracle Water and Servisoft Water were in direct competition. In 1978, Miracle Water had over 1,800 accounts while Servisoft Water had approximately 1,200 accounts. Oxley wanted to buy Miracle Water to acquire its rental accounts; he would then be in a better position to set the prevailing rental amount in the Muncie area and thereby increase his profit margin. Oxley considered the condition of the water softening units and the other tangible assets, the cost of purchasing new units, the fact that the units were already installed in homes, and the amount of rental income generated by the water softening units in determining whether to offer petitioners' asking price. On August 17, 1978, Oxley delivered a document captioned "Proposal to Purchase Assets of Miracle Water of Indiana by John Oxley -- D/B/A Servisoft Water of Delaware County" to Holaday, who gave it to petitioners. The proposal, which was prepared by Oxley, provided as follows: Servisoft Water offers total sum of $330,000.00 for the purchase of all rental accounts and equipment--approximately 1800 and all six vehicles. *618 Also all used equipment and parts in stock and all tools and equipment pertaining to the installation and service of water conditioners. Also all office equipment and all accounts receivable. What is not included in this proposal are retirement funds and liabilities of retirement funds. Also money in the bank at the time of purchase or the building used by Miracle Water. Other items not included in sale are new water conditioners, salt and new water conditioner parts which will be purchased on a cost basis. All taxes now due and payable by Miracle Water of Indiana will remain the responsibility of Miracle Water of Indiana and not the responsibility of Servisoft. Under terms of purchase, Servisoft Water will not be responsible for any debts, liabilities, or obligations occurred [sic] by Miracle Water as the proposal is to purchase assets of corporation and not the corporation. Proposal is only good under term that Servisoft is able to achieve proper financing for purchase. On September 15, 1978, Oxley delivered to Holaday a formal offer, prepared by Oxley's attorney and open until September 19, for the purchase of Miracle Water's assets. This proposed agreement of *619 sale allocated the total purchase price of $330,000 among assets as follows: All used water conditioning
$297,000.00
units and used replacement
parts (described generally
per Schedule "A" attached).
All motor vehicles (described
$ 9,000.00
generally per Schedule "B" attached).
All office furniture
$ 1,200.00
fixtures and equipment (described
generally per Schedule "C" attached).
All tools and other miscellaneous
$ 1,000.00
tangible personal property (described
per Schedule "D" attached).
All customer lists and/or cards
$ 500.00
(which will include address of
customer, type of equipment,
location of equipment and monthly
charge being paid for the rental
of all such units are to be furnished
to me on or prior to closing) and the
name "Miracle Water of Indiana, Inc."
All accounts receivable
$ 20,000.00
(described per Schedule "E"
attached).
All expendable inventory (other
$ 300.00
than salt) and supplies (described
per Schedule "F" attached).
Total
$329,000.00
PLUS, at closing I will additionally purchase for cash all of Company's (a) new and usable water conditioning equipment units and (b) new and usable replacement parts *620 for the units purchased at (a) above and (c) usable salt for a sum equal to the actual net cost paid by Company to its suppliers for the purchase of such property less $5,000.00. Further, I will pay to you One Thousand Dollars ($1,000.00) for a covenant not to compete as hereinafter set forth herein. * * * SCHEDULE A
1,820
rental units in homes
16
rebuilt units in office
10-15
used units to be rebuilt, located in shop
John reviewed the proposed agreement of sale with Holaday. John understood the sum of $297,000 allocated to the water conditioning units to include compensation for the rental accounts transferred along with the actual units. Neither he nor Holaday discussed this with Oxley, however. On September 19, 1978, Pauline Grow, as president of Miracle Water, accepted Oxley's offer as submitted. The assets were transferred to Oxley on November 17, 1978, and the corporation was paid $330,000 in cash.The books and records of the corporation described the 1,820 water softening units installed in homes as follows: Number [2]
Total
Class
Purchased
Cost or Other
Accumulated
Adjusted
Year
(Approximate)
Basis
Deprec. Claimed
Basis
1964
130
$13,136.36
$13,136.36
1965
130
15,884.17
15,884.17
1966
100
10,663.12
10,663.12
1967
155
18,863.46
18,863.46
1968
205
25,423.92
25,423.92
1969
145
15.604.28
15,604.28
1970
155
21,307.08
21,307.08
1971
140
24,776.66
24,776.66
1972
120
22,374.64
22,374.64
1973
110
24.967.60
21,725.35
3,242.25
1974
110
25,749.97
16,843.15
8,906.82
1975
100
14,550.27
8,275.12
6,275.15
1976
140
23,676.60
10,128.71
13,547.89
1977
80
14,108.00
5,027.00
9,081.00
Totals
1,820
$271,086.13
$230,033.02
$41,053.11
*621 The corporation was liquidated under section 337 on November 17, 1978, and its assets were distributed to petitioners. In the notices of deficiency issued to Pauline Grow and John and Arunee Grow, respondent determined, interalia, that Miracle Water had ordinary income under section 1245 in the amount of $1,133.22 from the sale of furniture and in the amount of $230,033.02 from the sale of water softening units and that petitioners, as shareholders, were required to report these amounts on their respective returns in accordance with their ownership interests. Petitioners now concede that the amount received by Miracle Water from the sale of furniture should have been reported by them as ordinary income. OPINION Petitioners acknowledge that the water softening units owned by Miracle Water and sold to John Oxley on November 17, 1978, constitute section 1245[3] property as defined by section 1245(a)(3). Petitioners also concede that section *622 1245(a)(1) requires Miracle Water to recognize as ordinary income the difference between the total adjusted basis of the units and the amount realized upon their disposition, and that, as 100 percent shareholders of Miracle Water, petitioners are required to report that income on their individual 1978 returns. It is the amount of ordinary income realized by Miracle Water on the sale of the water softening units that is in dispute. *623 Section 1.1245-1(a)(5), Income Tax Regs., provides: (5) In the case of a sale, exchange, or involuntary conversion of section 1245 and non-section 1245 property in one transaction, the total amount realized upon the disposition shall be allocated between the section 1245 property and the non-section 1245 property in proportion to their respective fair market values. In general, if a buyer and seller have adverse interests as to the allocation of the amount realized between the section 1245 property and the non-section 1245 property, any arm's length agreement between the buyer and the seller will establish the allocation. In the absence of such an agreement, the allocation shall be made by taking into account the appropriate facts and circumstances. Some of the facts and circumstances which shall be taken into account to the extent appropriate include, but are not limited to, a comparison between the section 1245 property and all the property disposed of in such transaction of (i) the original cost and reproduction cost of construction, erection, or production, *624 (ii) the remaining economic useful life, (iii) state of obsolescence, and (iv) anticipated expenditures to maintain, renovate, or to modernize. In this case, the agreement of sale specifically allocated $297,000 of the total purchase price to section 1245 property, i.e., "water softening units and used replacement units parts" described in "Schedule A" as "rental units in homes," "rebuilt units in office," and "used units to be rebuilt located in shop." This Court has consistently held, however, that a taxpayer may overcome the specific terms of an agreement by producing "strong proof" that the written agreement does not accurately reflect the contracting parties' intent and the economic realities of the transaction. Peterson Machine Tool, Inc. v. Commissioner,79 T.C. 72 (1982), on appeal (10th Cir., Dec. 7, 1982); Major v. Commissioner,76 T.C. 239 (1981). The cases in this area are usually concerned with the proper allocation of part of the purchase price of a business between a covenant not to compete and goodwill, see, e.g., Peterson Machine Tool, Inc. v. Commissioner,supra; *625 Major v. Commissioner,supra;Lazisky v. Commissioner,72 T.C. 495 (1979), affd. sub nom. Magnolia Surf, Inc. v. Commissioner,636 F.2d 11 (1st Cir. 1980); Lucas v. Commissioner,58 T.C. 1022 (1972); Rich Hill Insurance Agency, Inc. v. Commissioner,58 T.C. 610 (1972), but the "strong proof" rule has also been held applicable in other types of cases in which a taxpayer seeks to disavow the specific terms or structure of an arm's-length transaction. See Miami Purchasing Service Corp. v. Commissioner,76 T.C. 818 (1981) (where did title pass from petitioner to buyer); Stephens v. Commissioner,60 T.C. 1004 (1973), affd. 506 F.2d 1400 (6th Cir. 1974) (whether petitioners were legally obligated to buy stock). [4] There is no reason not to apply the same rule to allocations between section 1245 property and non-section 1245 property. *626 Respondent urges us to adopt (instead of the "strong proof" rule) the standard announced by the Court of Appeals for the Third Circuit in Commissioner v. Danielson,378 F.2d 771 (3d Cir. 1967). In that case the court held that a taxpayer who sought to disregard an allocation between a covenant not to compete and a contract for the sale of stock was required to adduce proof that, in an action between the parties to the agreement, would be admissible either to alter the express terms of the contract or to show its unenforceability due to mistake, undue influence, fraud, or duress. Respondent argues that the tax consequences of a sale are usually a factor in determining the sale price and that both the Commissioner and the parties to the sale should be able to rely upon the transaction as structured by the parties. If only circumstances such as those set forth in the Danielson rule induce a court to change the allocation in a contract, respondent argues, then tax consequences will be more predictable and litigation will be less prevalent. Respondent's argument that taxpayers should be held to the express language of their agreements is appealing. While as *627 a general rule, we agree that taxpayers should be bound by their own deliberate actions, in allocation cases it is necessary to consider the substance of a sale over its form to prevent taxpayers from manipulating the form of a transaction to subvert the tax policy inherent in statutes enacted by Congress. In such cases, the petitioner's tax burden is being balanced against another taxpayer's burden (even if that other taxpayer is not before us). Distribution of those burdens must accurately reflect economic reality and be consistent with applicable statutes and regulations regardless of whether respondent or petitioner is asking us to look beyond the form of the transaction. By requiring strong proof, we minimize meritless, unilateral attacks on transactions, while still giving effect to the substance of a transaction for tax purposes. See Lazisky v. Commissioner,supra at 501. The Seventh Circuit Court of Appeals, to which this case is appealable, has not directly ruled on whether a standard stricter than "strong proof" is applicable. In Wilson Athletic G. Mfg. Co. v. Commissioner,222 F.2d 355, 357 (7th Cir. 1955), however, the court *628 said: But in tax matters we are not bound by the strict terms of the agreement; we must examine the circumstances to determine the actualities and may sustain or disregard the effect of a written provision or of an omission of a provision, if to do so best serves the purposes of the tax statute. Higgins v. Smith, 308 U.S. 473 at page 477, 60 S. Ct. 355, 84 L.Ed. 406. The incidence of taxation depends upon the substance of the transaction. Tax consequences are not to be finally determined solely by the mechanical means employed to transfer legal title. We must look to the realities. This Court has subsequently proceeded on the basis that the strong proof standard would be acceptable to the Seventh Circuit. See Major v. Commissioner,supra at 249. We, therefore, adhere to our previous decisions and apply the "strong proof" rule. [5]
*629 There are two primary elements to which petitioners' elevated burden of proof relates. Under the "strong proof" rule, petitioners must prove that the rental accounts to which petitioners seek to allocate a portion of the sales price were actually intended to be transferred as part of the sale and also that the accounts had independent economic significance such that we might conclude that they were a separately bargained-for element. Peterson Machine Tool, Inc. v. Commissioner,supra at 81; Lucas v. Commissioner,surpa at 1032. Petitioners have met their burden of proof with respect to both of these factors. John testified that the asking price for Miracle Water was determined, at least in part, by reference to the annual rental yielded by the corporation's assets. The 1,820 units were yielding in excess of $165,000 yearly in rental income by 1978. The income produced by the water softening units was the most outstanding aspect of the business, and the rental contracts, according to John, were the most valuable assets sold. Oxley corroborated John's *630 evaluation of the components of the sale when he testified that his primary reason for purchasing Miracle Water was to acquire the rental accounts. Oxley further testified that having control of Miracle Water's rental accounts was valuable to him because it would give him greater influence over the standard rental charged in the Muncie area and permit him to increase his profit margin on each account. The proposal of August 17, drafted by Oxley, specifically mentioned the rental accounts as among the assets to be purchased. The subsequent formal offer drafted by his attorney deleted specific reference to the rental accounts. Oxley may have decided to make no express allocation of part of the purchase price to the rental accounts after being apprised of the tax benefits of allocating a large sum to depreciable assets, but it is the intent to sell and purchase the rental accounts--not the intent to manipulate the tax consequences--that is controlling. Both John Grow and John Oxley considered the ownership of the rental accounts important, probably essential, and we conclude that they intended to transfer those accounts as part of the sale. The rental contracts have an identifiable *631 economic existence in the contract of sele, and some portion of the purchase price must be allocated to them. [6] Reallocation of the $297,000 between the contracts and the physical units, i.e., the section 1245 property, is therefore necessary. At the trial, the parties produced owners of water softening businesses as expert witnesses who testified with respect to the value of the units and the installations performed by Miracle Water. Petitioners' witness, Willard Bourquein (Bourquein), had exclusively used "Miracle Water" units in his business from 1966 to 1974. In 1974 or 1975, he changed to another brand of equipment because he perceived a drop in the quality of the "Miracle Water" units. At the time of trial, however, he was still renting some Miracle Water units and had sold many used units, including the 15,000 grain size, the 20,000 grain size, and the 40,000 grain size, throughout the years. Bourquein estimated the value of the units sold by petitioners, including the rebuilt and broken units that were not subject to rental *632 agreements in 1978, based on a schedule prepared by John from the corporate books that showed the number and size, class year, and cost of the units, as well as the total depreciation taken. Bourquein estimated the value of the 1,820 rented units to be $72,800, or an average of $40 each; the value of the 16 rebuilt units to be $1,600, or $100 each; and the value of the broken units to be $25 each. Bourquein testified that he based his opinion with respect to the rented units on his personal experience selling used water softeners that were not installed. He stated that, after petitioners requested his opinion, he reviewed his records to see what he had received for used units. The $40 value he reached for units in customer's homes is an average yield from the sale of the three different sizes of units sold by him. He also testified that the value given by him to the rebuilt units was higher because replacement parts for "Miracle Water" units had become more costly. With respect to installation costs, Bourquein explained that his average cost was higher than Miracle Water's average cost because part of his business was in Ohio, and Ohio had more stringent plumbing requirements. *633 He stated his average cost of installing a unit in a home without existing plumbing for a unit was $100, and his average cost of installing a replacement unit was $40. Respondent's expert witness, Charles McKee (McKee), who owned a water softening business located about 50 miles from Muncie, ascribed an average value of $75 to each of the rental units, an average value of $125 to the rebuilt units, and an average value of $35 to the broken units, for a total value for all units of $139,025. He based his opinion on a factual statement provided by respondent that described the rented units as acquired from 1964 through 1977 and having an average age of 7 years. He also considered his experience in buying used units from other dealers and from customers and the cost in 1978 of buying new units, which was between $210 to $255 each per 20,000 grain unit when purchased in lots of 50. A 40,000 grain unit cost approximately $250 to $275 each when purchased in lots of 50. In McKee's experience, a Servisoft water softener might last as long as 15 years with proper maintenance. McKee testified that he charged customers $30 to replace a unit and from $100 to $150 for a new installation.
*634 John Grow testified that his cost of installation was $15 per unit if the necessary plumbing was in place. With extensive explanation of the difficulty of valuing a used water softening unit, as contrasted to the rental account, he "guessed" that no one would pay more than $25 to $40 for a unit. There are some weaknesses to the factual bases of both experts' opinions that undermine their conclusions. Neither is using experience in selling in bulk units equivalent to those sold by petitioners. McKee's estimated value of the 1,820 units is almost double Bourquein's estimated value, even though the men have comparable experience and were valuing the same assets. This discrepancy demonstrates the imprecision inherent in valuation matters and underscores the need for the parties to settle these issues themselves. As we stated in Messing v. Commissioner,48 T.C. 502, 512 (1967): Too often in valuation disputes the parties have convinced themselves of the unalterable correctness of their positions and have consequently failed successfully to conclude settlement negotiations--a process clearly more conducive to the proper disposition of disputes such as this. *635 The result is an overzealous effort, during the course of the ensuing litigation, to infuse a talismanic precision into an issue which should frankly be recognized as inherently imprecise and capable of resolution only by a Solomon-like pronouncement. See Commissioner v. Marshall,125 F.2d 943, 946 (C.A.2, 1942); Bosland, "Tax Valuation by Compromise," 19 Tax L. Rev. 77 (1963). We conclude that the portion of the purchase price to be allocated to the sale of the water softening units is $130,000. Petitioners did not present any proof with respect to their claim that a portion of the purchase price should be allocated to goodwill. Accordingly, we make no such allocation. See Rule 142(a), Tax Court Rules of Practice and Procedure.
Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue.↩
2. Although this figure does not include the units not installed at the time of sale, the parties are in agreement with respect to total cost, adjusted basis, and amount of depreciation claimed with respect to the units sold.↩
3. Sec. 1245(a). General Rule.-- (1) Ordinary income.--Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of-- (A) the recomputed basis of the property, or (B) (i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or (ii) in the case of any other disposition, the fair market value of such property. exceeds the adjusted basis of such property shall be treated as ordinary income. Such gain shall be recognized notwithstanding any other provision of this subtitle. * * * (3) Section 1245 property.--For purposes of this section, the term "section 1245 property" means any property which is or has been property of a character subject to the allowance for depreciation provided in section 167 (or subject to the allowance of amortization provided in section 185) and is either-- (A) personal property, (B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property)-- (i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or (ii) constituted a research facility used in connection with any of the activities referred to in clause (i), or (iii) constituted a facility used in connection with any of the activities referred to in clause (i) for the bulk storage of fungible commodities (including commodities in a liquid or gaseous state), (C) an elevator or an escalator, or (D) so much of any real property (other than any property described in subparagraph (B)) which has an adjusted basis in which there are reflected adjustments for amortization under section 169, 185, 188, or 190↩.
4. See also State Pipe & Nipple Corp. v. Commissioner,T.C. Memo. 1983-339 (identity of the buyer under the agreement); and Sanborn v. Commissioner,T.C. Memo. 1983-579↩ (whether the agreement was a sale-leaseback or a financing agreement).
5. The "strong proof" rule has also been adopted by the First, Second, Fifth, and Sixth Circuits. Harvey Radio Laboratories, Inc. v. Commissioner,470 F.2d 118 (1st Cir. 1972), affg. T.C. Memo. 1972-85; Ullman v. Commissioner,264 F.2d 305 (2d Cir. 1959); Balthrope v. Commissioner,356 F.2d 28 (5th Cir. 1966), affg. T.C. Memo. 1964-31; Montesi v. Commissioner,340 F.2d 97↩ (6th Cir. 1965).
6. See, e.g., Pack v. Commissioner,T.C. Memo. 1980-65,; Armstrong v. Commissioner,T.C. Memo. 1977-30↩.